[Nos. H034104, H034127, H034869, H035337, H036368. Sixth Dist. Feb. 23, 2012.]

In re the Marriage of RICHARD S. FALCONE and KATHEY FYKE.
RICHARD S. FALCONE, Respondent, v.
KATHEY FYKE, Appellant.

**COUNSEL**

Kathey Fyke, in pro. per., for Appellant.

Law Offices of Bernard N. Wolf, Bernard N. Wolf; Law Offices of Yates-Carter and Lynne Yates-Carter for Respondent.

**OPINION**

**PREMO, J.**—These are five more in propria persona appeals that we are considering together in the series of appeals or writ petitions filed in this court since 2005 by Kathey Fyke in her dissolution of marriage proceeding with Richard S. Falcone. Here, Kathey[1] challenges (1) a judgment distributing marital property (H034104), (2) a postjudgment order awarding attorney fees, costs, and sanctions against her (H034127), (3) a postjudgment order confirming an accounting and distributing funds (H034869), (4) a postjudgment order awarding sanctions against her for appealing an order awarding sanctions against her (H035337), and (5) a prejudgment order awarding sanctions against her for misconduct in her efforts to obtain a trial continuance (H036368). We reject the challenges and affirm the judgment and orders. We also find that Kathey is a vexatious litigant henceforth subject to a prefiling order pursuant to Code of Civil Procedure section 391.7.[2]

<u>H034104—THE JUDGMENT DISTRIBUTING MARITAL PROPERTY</u>

*Background*

During in limine proceedings before trial court Judge Thomas William Cain, Kathey made a request for need-based attorney fees pursuant to Family Code section 2031, subdivision (b)(1), which allows that such a motion may be made orally, without notice, at the time of the hearing of the cause on the merits. The colloquy is as follows.

"[Kathey]: Okay. On May 12th, you told me that I couldn't file any more motions, and I respected that. But I have a couple issues that I would like to address that are kind of—I would like to make one more request for attorney's fees. I'd like to make that in accordance with Family Code 2031(b), that provides for oral motion. And, again, because the opposition had asked you that I not be able to file any more motions, I'm putting it in the form of an oral motion. [¶] I have the 5-12 transcript if you would like to look at that. I—I have a current I&E. One was recently filed. I'm not sure if you have it, but I brought a courtesy copy for you. I'm prepared to discuss the financial capabilities of both parties. I also brought the required . . . [¶] . . . [¶] . . . three years of tax returns with me. [¶] I'd like to address the Saratoga funds which seem to be brought up a lot. And given the fact if I touch the fruits of the judgment, I waive my right to appeal the sale of the

---

[1] " 'As is customary in family law cases, we will refer to the parties by their given names for purposes of clarity and not out of disrespect.' " (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 817, fn. 1 [79 Cal.Rptr.3d 588].)

[2] Further unspecified statutory references are to the Code of Civil Procedure.

Saratoga home—. . . I think there is no parity in our representation. I realize that this is the 11th hour, but I would still like to request attorney fees.

"THE COURT: The request is denied.

"[Kathey]: Okay. Can I request attorney fees for the appeal process?

"THE COURT: The request is denied.

"[Kathey]: Okay. Along those—can I ask why?

"THE COURT: Not timely.

"[Kathey]: To both of them?

"THE COURT: Yes, among other reasons."

Also during the in limine proceedings, the trial court granted Richard's motion "to exclude testimony and documents as to any reimbursement claims that [Kathey] might have, and expenses, that based on failure to provide documentation in discovery for which she was ordered to produce, including characterization, valuation, division of assets, any reimbursement claims she might have or expenses, attorney's fees, health issues." During the proceedings, it remarked: "You were ordered to produce. You have produced very little, if anything." It observed: "I'm looking at binders that you've provided to the Court. [¶] . . . [¶] Four full binders of 215 exhibits. [¶] . . . [¶] . . . [But] the only thing that's attached to [your response to form interrogatories] is two tax returns and two mortgage statements. [¶] . . . [¶] I'm just saying that's all you've produced, yet you've provided me with four binders of 215 exhibits." Concerning Richard's request for production of documents, the trial court asked Kathey "What else did you produce?" When Kathey replied that "I produced probably 25 [or 12] boxes of stuff," the trial court asked Kathey "To whom did you provide these 12 boxes of documents?" Ultimately, Kathey replied: "I didn't give them to anybody . . . ." The trial court also declined Kathey's request to consider a specific real estate appraisal after remarking that the case had been continued for reasons of Kathey's health and Kathey had obtained the real estate appraisal during the interim. It concluded: "Let's put it this way, [Kathey]. I'm going to grant the exclusion and it's going to be up to you, if you attempt to produce something, to demonstrate that it was provided in response to either their interrogatories, requests for production, or prior order of the court. And failing that, it will not be considered."

The trial court finally noted that the parties had agreed to bifurcate the issue of attorney fees: "Because with regard to attorney's fees, it's my

understanding that [Richard] has requested that the issue be bifurcated and heard by declaration, or whatever, posttrial. And I gathered from the items that [Kathey] had provided me that sounded like [Kathey] had no objection to that." To this, Kathey replied, "No." She then added, "But with regards to that, I would like to do it in person, not just by paper." The trial court then concluded: "Well, again, we can address the forum, but the concept being it's separated and we'll deal with it after the trial."

The trial court conducted the trial in 2008 on August 13 through 15, 18 through 22, 25 through 27, and October 6 through 7. During trial and Kathey's testimony, the trial court reminded Kathey that the trial was scheduled to take two weeks "And we got to the end of it and to be fair to you, I wanted to give you a chance to testify because we never got to your testimony. [¶] . . . [¶] That's why I gave you the extra day over objections of opposing counsel. So I just wanted to warn you. I am aware that you are concerned about having enough time. It's up to you how you want to use it." Kathey nevertheless again objected to "the time limit of only one day." She explained: "It is my understanding that the trial was originally estimated to require two weeks. We've only had four full days and six half days, equating to seven days, not the ten days as originally requested. Those days were used by [Richard] to present his case." The trial court then replied as follows: "Well, [Kathey], as I repeatedly reminded you during the course of the earlier two-week proceedings that you were burning time over nonproductive matters. It was not unusual for [Richard] to present a witness that took 20 minutes and you spent literally four hours in unproductive cross-examination. [¶] I kept warning you that you are burning your own time and you continued to pursue every witness in that same unproductive fashion, to the point that if you are short of time you have no one to blame but yourself. Consequently, request for further time beyond the two days—excuse me—the two afternoons is denied." Kathey nevertheless continued to argue with the trial judge raising points such as "a comment that [the trial court] made back in August . . . [¶] . . . [¶] [r]egarding those 20 boxes of documents and the discovery issues," "this is a case of abuse of . . . power," and "[Richard's] intent was to leave [her] without the funds to maintain her own attorney." This argument takes up six pages of the reporter's transcript after which the trial court inquired, "Again, why are you testifying to all of this? What does this have to do with the issues before me? This sounds like a closing argument. It doesn't sound like testimony with regard to the property issues." Kathey continued making her points motivating the trial court to ask, "Why don't you get to the property issues. That's what's before the Court." When Kathey did not address the property issues, the trial court commented: "Well, I don't understand why you are going through the history of who represents whom and who you contacted and everything else. None of this has to do with the property issues. You've got a lot of property issues you need to

address." After the trial court stated "I don't even know what your basic position is as to any of the issues," Kathey exclaimed, "That's what I'm trying to preface here. I could have been through by now. We wasted 10 minutes on this."

The trial court rendered a proposed statement of decision, a statement of decision incorporating the proposed statement, and a judgment incorporating the statement. The judgment expresses the following.

"The issues that are addressed below are all matters that could have been resolved by the parties with even the least bit of cooperation on the part of [Kathey]. [¶] Although in contested matters there is generally fault to be found with both sides, in this matter, the relatively isolated shortcomings of [Richard] pale in comparison to [Kathey's] delay tactics; the lack of <u>any</u> ascertainable direction or remotely perceptible objective on her part as to <u>any</u> issue; the endless motions (most of which had been previously been [*sic*] repeatedly ruled upon); the virtually valueless and lengthy time-consuming cross-examination of each and every trial witness; her many emotional outbursts; and, her endless pretrial insistence upon providing almost nothing in terms of discovery responses to [Richard], that not only gave little indication as to where she was headed on the various issues, but resulted in the granting of an <u>in limine</u> motion that prevented her from presenting anything at time of trial that had not been previously provided to the other side which, unfortunately, placed her in a virtually impossible position to effectively advance anything on her own behalf. [¶] . . . [¶] As a somewhat belated preface, it cannot be stressed too strongly how difficult it had been to commence the preparation of this 'ORDER.' This is because even though the undersigned may disagree with the methodology by which someone chooses to proceed towards a particular trial objective, one can often still speak positively about the objective itself, or even if the objective itself is unrealistic, at least there is a philosophical understanding that can be acknowledged. But, when no such trial objective can be ascertained, and all that is presented is the questionable or disagreeable methodology, it is hard to start out in any way but in a manner which would not be perceived as being negative and one-sided. And, if such was not, in and of itself, difficult enough, the Court was presented at the outset of the trial with a disturbing complication. [¶] Exhibit 'I' was 87 proofs of service covering the period November 2, 2006, to August 11, 2008 (the last being two days before the commencement of the trial herein), that were attached to (and filed with) [Kathey's] pleadings that were served upon [Richard's] counsel. All of the proofs of services were signed by a 'Dora Williams' whose address was '1070 Reed Avenue, Sunnyvale California 94086.' <u>Under oath,</u> [Kathey] described Dora Williams as a friend; where she resided and worked; and, more importantly, stated that she, [Kathey], <u>did not sign</u> the proofs of service. Testimony was then received that various means were utilized to locate Dora Williams, but without

success. The resident manager of 1070 Reed Avenue in Sunnyvale for the past six years testified that she has never had contact with a 'Dora Williams,' and has never even heard of her (she also having reviewed records back into the 1990's with similar results). An expert forensic document examiner . . . then testified that a comparison of samples of [Kathey's] handwriting . . . with these proofs of service, caused her to reach the conclusion that the signature was not a true signature, and it was 'highly probable' (95+%) certain that it had been written by [Kathey]. Consequently, there was not only more than sufficient evidence to demonstrate that [Kathey] had not only given false testimony under oath, but that the proofs of service, that were executed 'under penalty of perjury,' by someone who was 'a resident of the State of California, over the age of eighteen years, and not a party to the within action,' was fraudulently prepared by [Kathey]. . . . [¶] Understanding that this all came unannounced to [Kathey] at the very outset of the trial, the Court waited until the commencement of the next day's proceedings to point out its very serious concerns over this matter as it then stood, and its impact upon the believability of any of [Kathey's] subsequent trial testimony. It also expressed the need to remove this 'cloud' by having Dora Williams come into court and testify, under oath, as to these proofs of service. Subsequent thereto, almost on a daily basis, the Court inquired as to when it could expect to hear from Ms. Williams. [Kathey's] repeated response was either that she 'refused to say,' or that 'I'm working on it.' As the end of the trial drew near, the Court set a time for Dora Williams to be present, or the Court would be forced to conclude that she did not exist, and that it was [Kathey] who, in fact, had executed the proofs of service. At that date and time, [Kathey] did not produce Dora Williams, nor did she provide the Court with a satisfactory reason why she could not do so. [¶] It is important to understand that false testimony under oath, and the fraud that the execution of the proofs of service played upon [Richard], his counsel, the Court, and on the legal process itself, was not the only error that [Kathey] committed as to this issue. With the Court, by repeatedly asking [Kathey] as to the status of her efforts to bring in Dora Williams, was also, in effect, giving [Kathey] an opportunity to 'come clean' and admit that Dora Williams did not exist. But, by her responding that she 'refused to say,' or worst [sic] still, that 'I'm working on it,' was itself yet another lie, a lie that was repeated upon each inquiry by the Court."

The judgment then found and equally divided an equity of approximately $600,000[3] in the Sunnyvale family residence in which Kathey resided, found a rental value from the date of separation until trial ($286,000) and charged Kathey with one-half of that amount, divided funds held in a Wells Fargo

---

[3] For clarity, specific amounts of money that we recount may be approximate amounts. As to the family residence equity, the judgment ordered Kathey to pay Richard one-half the equity within 60 days by refinancing the residence and removing Richard from the title and existing mortgage obligation.

trust account ($1.8 million) from the sale of the parties' Saratoga real property (56.5 percent to Kathey, which accounted for prior disbursements), and provided that the trust account funds would be the source of an equalizing payment to be determined following the posttrial hearing on attorney fees. It then divided the community interest in Richard's pension plans ($685,000) and accounted for certain of Richard's partnership distributions. It also accounted for Richard's separate funds used by Kathey since separation for support while there was no pendente lite support order in effect ($1.2 million) and found an amount for reimbursement to Richard ($585,000) representing those separate funds used by Kathey that were over and above reasonable support that would have been due under the Santa Clara County support guidelines. It then awarded Kathey $261,000 for additional support pursuant to an existing order obligating Richard for additional spousal and child support "pursuant to a Smith/Ostler calculation" from his additional income over and above $17,000 monthly. It noted that "The appropriate percentage that was to be utilized to obtain such a Smith/Ostler determination, or the amount due, or even the date by which such additional support was to be paid, was never set, and no subsequent motion was ever filed to determine any of these unknown aspects." The judgment then makes other miscellaneous findings and distributions. It concludes: "The court refers both the issue of the fraudulent proofs of service and the violation of the restraining order on the trust funds by [Kathey] to the Santa Clara County District Attorneys Office for investigation and, if appropriate, prosecution."

Kathey contends that the trial court erred by (1) denying her motion for attorney fees, (2) precluding her from introducing evidence, (3) limiting the time to present her case, (4) finding against her credibility before she had put on her case, and (5) making three property rulings (offsetting Smith/Ostler support arrearages against debt, reimbursing Richard for the separate funds used while there was no pendente lite order in effect, and reimbursing the community for the fair rental value of her residence). These contentions have no merit.

*Attorney Fees*

■ Pursuant to Family Code sections 2030 and 2032, the trial court is empowered to award fees and costs between the parties based on their relative circumstances in order to ensure parity of legal representation in the action.[4] It is entitled to take into consideration the need for the award to

---

[4] Family Code section 2030, subdivision (a)(1) provides that "the court shall ensure that each party has access to legal representation, including access early in the proceedings, to preserve each party's rights . . ." by ordering one party to pay to the other party, "whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding." Subdivision (c) of section 2030

enable each party to have sufficient financial resources to present his or her case adequately. In assessing a party's relative need and the other party's ability to pay, it is to take into account " ' "all evidence concerning the parties' current incomes, assets, and abilities." ' " (*In re Marriage of Dietz* (2009) 176 Cal.App.4th 387, 406 [97 Cal.Rptr.3d 616].) That a party who is requesting fees and costs has the resources is not, by itself, a bar to an award of part or all of such party's fees. Financial resources are only one factor to consider. (*Ibid.*) The trial court may also consider the other party's trial tactics. (*In re Marriage of Tharp* (2010) 188 Cal.App.4th 1295, 1314 [116 Cal.Rptr.3d 375]; *In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1157 [62 Cal.Rptr.2d 466] [trial court may consider trial tactics (normally a matter for sanctions) in a Fam. Code, § 2030 award].)

In summary, the proper legal standard for determining an attorney fee award requires the trial court to determine how to apportion the cost of the proceedings equitably between the parties under their relative circumstances. (*In re Marriage of Dietz, supra,* 176 Cal.App.4th at p. 406.) In making this determination, the trial court has broad discretion in ruling on a motion for fees and costs; we will not reverse absent a showing that no judge could reasonably have made the order, considering all of the evidence viewed most favorably in support of the order. (*In re Marriage of Sullivan* (1984) 37 Cal.3d 762, 768–769 [209 Cal.Rptr. 354, 691 P.2d 1020].) However, "although the trial court has considerable discretion in fashioning a need-based fee award [citation], the record must reflect that the trial court actually exercised that discretion, and considered the statutory factors in exercising that discretion." (*In re Marriage of Braud* (1996) 45 Cal.App.4th 797, 827 [53 Cal.Rptr.2d 179].)

Kathey argues that the trial court erred by denying her oral motion for attorney fees because it improperly denied the motion as untimely and failed

provides, "The court shall augment or modify the original award for attorney's fees and costs as may be reasonably necessary for the prosecution or defense of the proceeding, or any proceeding related thereto, including after any appeal has been concluded." A party may move for "a temporary order making, augmenting, or modifying an award of attorney's fees, including a reasonable retainer to hire an attorney, or costs or both" under section 2031, subdivision (a)(1). Section 2031, subdivision (b)(1) allows such a motion to be made orally, without notice, "[a]t the time of the hearing of the cause on the merits."

Family Code section 2032, subdivision (b) reads, as follows: "In determining what is just and reasonable under the relative circumstances, the court shall take into consideration the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately, taking into consideration, to the extent relevant, the circumstances of the respective parties described in Section 4320. The fact that the party requesting an award of attorney's fees and costs has resources from which the party could pay the party's own attorney's fees and costs is not itself a bar to an order that the other party pay part or all of the fees and costs requested. Financial resources are only one factor for the court to consider in determining how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances."

to consider the relative financial circumstances of the parties as required by Family Code section 2032, subdivision (b). We disagree.

Kathey is implicitly urging that the trial court failed to consider the merits of her motion because it found the motion to be untimely though the statute permits a motion to be made at the time of the hearing. But we do not so construe the trial court's remark. Here, Kathey admitted that she was making an "11th hour" motion that was repetitive ("one more request for attorney fees"). At no point did she explain why she had not used her own resources to hire an attorney who could prepare for trial on the date set for trial as well as seek need-based attorney fees on her behalf. She instead waited until trial to make a motion that, if granted, would require a trial continuance to hire an attorney and allow the attorney to prepare. Thus, the trial court's remark reflects its view that the 11th-hour nature of Kathey's motion was a factor in denying the motion rather than a procedural barrier to making the motion.

This interpretation is supported by the trial court's additional comment that untimeliness was only one "among other reasons" for denial of the motion. And other reasons do support the trial court's decision.

■ As mentioned, Kathey was making a repetitive motion. But at no point did she indicate to the trial court that she was making her motion because the parties' relative financial circumstances had changed since her prior motion had been denied. It is not irrational to deny a repetitive motion in unchanged circumstances.

Moreover, the instant motion was one in a series of Kathey's oral motions for attorney fees. Oral motions in this context, though permitted by the statute, do not precisely articulate the reasoning and authority underlying the request. (See Cal. Rules of Court, rule 3.1113(a) [court may construe absence of supporting memorandum as admission that the motion is without merit and cause for its denial].) We have before commented on Kathey's tactic of making oral motions for need-based attorney fees: "We find it curious that Kathey has apparently never once brought a written motion for need-based attorney fees pursuant to Family Code section 2031, subdivision (a)(1), particularly given her steadfast insistence that such fees are essential to protecting her interests in these proceedings. After several years of intensively litigating this case in propria persona at both the trial and appellate level, Kathey is obviously well-versed in law and motion practice." (*In re Marriage of Falcone & Fyke* (Mar. 5, 2009, H031458) [nonpub. opn.].) In addition, Kathey's other questionable conduct during the course of this litigation is well known. (See, e.g., *In re Marriage of Falcone & Fyke, supra*, 164 Cal.App.4th 814 [affirming $64,500 sanctions order against Kathey for prosecuting contempt motion without any factual or legal basis and pursuit of

a meritless motion for new trial].) Her tactics are relevant to evaluate the relative need-based fees between the parties and support the trial court's decision to deny such to Kathey.

We also observe that the trial court had before it Kathey's updated income and expense declaration, which was filed two days before Kathey made her motion. And it had Richard's updated trial statement with an updated income and expense declaration, which was filed on the same day. Contrary to Kathey's assertions, nothing in the record shows that the trial court was unfamiliar with and refused to consider the declarations. We therefore presume that the trial court considered these papers. (*In re Marriage of Falcone & Fyke, supra*, 164 Cal.App.4th at p. 822.)

*Kathey's Evidence*

Kathey contends that the trial court improperly excluded her trial binders and all her evidence. There is no merit to the contention. The trial court found that Kathey had willfully failed to comply with discovery. It therefore excluded Kathey's evidence as a discovery sanction, while allowing her to demonstrate that any proffered evidence was produced in discovery. (*Do It Urself Moving & Storage, Inc. v. Brown, Leifer, Slatkin & Berns* (1992) 7 Cal.App.4th 27, 36 [9 Cal.Rptr.2d 396].) Kathey makes no argument that the trial court abused its discretion in rendering the discovery sanction. The most that she advances is that "it was an abuse of the court's discretion to exclude Kathey's evidence on a discovery basis, when Richard had equal access to it all." But she supports the underlying fact with a double negative that "the transcript did not disclose that Richard actually claimed he did not have equal access to the documents." We treat the contention as forfeited. (*In re Marriage of Falcone & Fyke, supra*, 164 Cal.App.4th at p. 830.)

*Kathey's Time to Present Her Case*

Kathey complains about the trial court's imposition of a limit on her trial time. But the record and judgment are crystal clear that any constraint on the time to present her case was due to her own unproductive use of her time, which included arguing to the trial court about irrelevant issues. Moreover, Kathey fails to demonstrate prejudice resulting from the supposed time restriction upon her. (*In re Marriage of Falcone & Fyke, supra*, 164 Cal.App.4th at pp. 822–823.)

*Finding Against Kathey's Credibility*

Kathey complains that the trial court found that she had testified untruthfully about Dora Williams and the proofs of service "before [she] had an

opportunity to . . . produce evidence and witnesses to defend her innocence." There is no error here, and Kathey fails to cite authority to support that there is. Kathey's credibility was directly in issue. Richard proved facts so seriously impugning Kathey's credibility that the trial court was constrained to advise Kathey to produce rebuttal evidence. In any event, since Kathey failed to produce rebuttal evidence, the supposed error in finding against Kathey's credibility before Kathey put on her rebuttal evidence was harmless.

*Property Rulings*

Kathey contends that the trial court erred by offsetting Smith/Ostler support arrearages against debt. She fails to cite the part of the record where the trial court so offset. She has therefore forfeited the point.[5]

■ Kathey contends that the $585,000 reimbursement to Richard of his separate funds representing money over and above what was determined to be reasonable support was improper because that money was a gift. She relies upon that "there never was an agreement for Kathey to have to pay the funds back to [Richard]." There is no merit to this claim. Gifts from one spouse to another must be in writing. (Fam. Code, § 852.)

Kathey finally contends that the trial court improperly charged her with one-half the $286,000 rental value of her residence. According to Kathey, "Richard did not qualify for fair rental value, since Kathey paid all the community debts, including the mortgage, homeowner dues, taxes, insurance, maintenance and repair since the date of separation" and "Kathey did <u>not</u> make a claim for reimbursement of payments during this period." According to Kathey, "The granting of a rental value when there is no corresponding reimbursement of payments results in an unfair and unequal division of property." Kathey's analysis is erroneous.

■ "Where one spouse has the exclusive use of a community asset during the period between separation and trial, that spouse may be required to compensate the community for the reasonable value of that use." (*In re Marriage of Garcia* (1990) 224 Cal.App.3d 885, 890 [274 Cal.Rptr. 194].) The right to such compensation is commonly known as a "*Watts* charge." (See *In re Marriage of Watts* (1985) 171 Cal.App.3d 366, 374 [217 Cal.Rptr. 301].) Where the *Watts* rule applies, the court is "obligated either to order reimbursement to the community or to offer an explanation for not doing so." (*In re Marriage of Bell* (1996) 49 Cal.App.4th 300, 311 [56 Cal.Rptr.2d 623].) But "where the asset is not owned outright by the community but is

---

[5] There is no offset record because the trial court made no accounting in the judgment. It made the accounting in a postjudgment order from which Kathey has appealed (H034869).

being financed," the spouse in possession "may satisfy the duty to compensate the community for use of the asset by making the monthly finance payments from his or her separate property." (*In re Marriage of Garcia, supra*, at pp. 890–891.) Such offsets are commonly called "*Epstein* credits." (*In re Marriage of Epstein* (1979) 24 Cal.3d 76, 84–85 [154 Cal.Rptr. 413, 592 P.2d 1165].)

The trial court determines what is due the community "after taking into account all the circumstances" relevant to the exclusive possession by one spouse. (*In re Marriage of Watts, supra*, 171 Cal.App.3d at p. 374.)

Here, the trial court imposed a *Watts* charge upon Kathey and did not give her an *Epstein* credit. But this is because Kathey, by her own admission, did not make a claim for an *Epstein* credit. Kathey asserts that she did make a claim for $196,000 representing the years 2005 through August 2008. But the trial court rejected this claim "Based upon a lack of sufficient supporting evidence." As the trier of fact in this case, the trial judge was the exclusive judge of the credibility of the evidence. (*Hicks v. Reis* (1943) 21 Cal.2d 654, 659 [134 P.2d 788].) In that role, the judge may reject any evidence as unworthy of credence, even uncontradicted testimony. (*Id.* at pp. 659–660.)

## H034127—THE ORDER FOR ATTORNEY FEES, ETC.

On December 23, 2008, the trial court issued the statement of decision after trial. The statement ordered the following: "As to the reserved matter of attorney's fees and costs, this shall be handled by means of written declarations and supporting documentation, with each side filing their original requests by January 23, 2009; then any responses to the foregoing requests being filed by January 30, 2009; and, any replies by February 6, 2009, with the fees and costs issue being deemed to be under submission as of February 6, 2009."

Kathey filed an objection that the matter was to be heard as a reserved matter based only on written submissions rather than as a bifurcated trial. She claimed that, over her objections at trial, the trial court permitted Richard "to present evidence and testimony that solely went to the issue of attorney fees and costs." She claimed that "By restricting [her] defense to written submissions, [she was] prevented from cross examining [Richard's] witnesses and presenting her own rebuttal defense." She added that she wished to pursue discovery and have Judge Lucas rather than Judge Cain hear the matter because Judge Cain was not familiar with the three years of matters and hearings before trial. She complained about having only seven days to respond to Richard's papers: "Such an abbreviated period of time does not afford [Kathey] the time necessary to properly defend her interests, especially

in a situation where [Richard] is requesting hundreds of thousands of dollars in attorney fees in a matter that spans five years."

On January 21, 2009, Richard filed his supporting papers seeking $833,025 in attorney fees, costs, and sanctions under, among other authorities, Family Code sections 271 (sanctions), 1101, subdivision (g) (breach of fiduciary duty), and 2032 (just and reasonable attorney fees and costs). The papers principally consisted of a 1,500-page declaration by Richard's trial counsel detailing the fees and costs incurred by Richard and summarizing Kathey's "scorched-earth litigation tactics," which included at that time "thirteen (13) appeals, at least eleven (11) motions to vacate trial court decisions, another seven or eight motions for a new trial, and objections to virtually every single court order that was filed."

On January 30, 2009, Kathey filed her opposition papers, which consisted of over 100 pages advancing a litany of procedural, factual, and legal objections to Richard's request. For example, Kathey claimed that Richard did not file a notice of motion or serve a current income and expense declaration; she urged that a sanctions award would impose an unreasonable burden on her; she argued that attorney fees were not appropriate for the contempt and appellate matters; she stated that she had not breached her fiduciary duty regarding tax and pension issues even though the trial court had held to the contrary; she denied refusing to settle the case; she made 29 quibbles with trial counsel's declaration—many of which were objections based on hearsay or lack of personal knowledge about peripheral points; and she rehashed final matters, such as impugning Richard's trial expert for his appraisal of her residence because his "approach [was] contrary to standard appraisal methodology." Kathey admitted receiving "a property division with a gross value of $883,780." But she claimed a net worth of only $35,000 because of taxes and other debts.

On February 6, 2009, Richard replied to Kathey's opposition and, among other refutations, disputed Kathey's analysis of her financial situation ("[Kathey] has attached incomprehensible calculations [and] provided no documentation to substantiate the numbers that she is using"). Richard pointed out that Kathey's tax analysis did not "comport with generally accepted tax and accounting principles." He showed that Kathey would be receiving $288,000 from the property division rather than $95,000 as argued by Kathey. Richard reiterated that Kathey had $600,000 equity in her residence. And he reminded the court that Kathey had been charged in the property division with receiving over $1 million since separation but had never explained what she did with the money.

The trial court granted Richard's motion and awarded Richard $833,025 in attorney fees, costs, and sanctions "with these fees, costs, and sanctions being

paid from [Kathey's] portion of the remaining funds from the sale of the parties' Saratoga property that are held in a special trust account at the Wells Fargo Bank." It found: "The Court has considered the assets and debts of each Party, as well as their income and expenses. The Court finds that this order is just and reasonable under the relative circumstances of the respective parties; that it was necessitated by [Kathey's] conduct which by all means and extent imaginable frustrated the policy of the law to promote settlement and reduce litigation costs in an absolutely groundless fashion; and, based upon all of the foregoing, will not impose an unreasonable financial burden on [Kathey]."

*Statement of Decision*

Kathey contends that the trial court erred by failing to issue a statement of decision. (§ 632 [trial court's explanation of "the factual and legal basis for its decision as to each of the principal controverted issues at trial"].) There is no merit to the claim.

■ A trial court is not required to issue a statement of decision for an attorney fee award. (*Gorman v. Tassajara Development Corp.* (2009) 178 Cal.App.4th 44, 65 [100 Cal.Rptr.3d 152].)

■ In any event, Kathey failed to request a statement of decision. She argues that she made a request in her opposition papers. It is true that on page 29 of her 31-page opposition Kathey inserted the following paragraph: "[Kathey] respectfully requests a statement of decision on the matter of attorney fees. She requests the statement to include the basis for any numeric calculation as well as the underlying evidence used to compute any attorney fees, costs and sanctions." But this paragraph does not "specify those controverted issues as to which the party is requesting a statement of decision." (§ 632.) To the extent that the paragraph requests a statement on the "basis for any numeric calculation," the request does not go to a "principal controverted issue[]" at trial given that it was uncontroverted that the basis of the trial court's calculation was Richard's supporting declarations. The principal controverted issue at trial was Richard's right to attorney fees and sanctions, not the basis for calculating any award. Kathey's claim that she submitted a second request for a statement of decision five days after the trial court filed its amended order is also without merit. This five-page request, rather than a request for the legal/factual basis for the trial court's decision on the principal controverted issues, was instead a document that made a laundry list of 52 demands including such items as "The specific behaviors that were deemed sanctionable under Family Code section 271" and "The mathematical breakdown of the portion of attorney fees and costs associated with the behaviors identified as sanctionable under Family Code

section 271." In other words, Kathey sought findings on evidentiary facts without suggesting the specific factual finding requested. "Such a requirement cannot be made of the court." (*People v. Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 525 [206 Cal.Rptr. 164].) " 'The established practice presupposes that counsel desiring such special findings will draft and propose them in the usual form [citation]. The action of the court in approving or disapproving them will constitute the ruling. [Kathey] here sought to conduct a general inquisition and neither drafted nor submitted any proposals for such consideration.' " (*McAdams v. McElroy* (1976) 62 Cal.App.3d 985, 993 [133 Cal.Rptr. 637].)

*Due Process*

Kathey contends that the trial court denied her due process because it bifurcated the attorney fees and sanctions issue from the trial and heard the matter on the written submissions rather than live testimony. She relies on *Elkins v. Superior Court* (2007) 41 Cal.4th 1337 [63 Cal.Rptr.3d 483, 163 P.3d 160] (trial court's discretion to exclude oral testimony does not apply to trials). There is no merit to the point.

*Elkins* involved a challenge to a local superior court rule requiring that parties present their case in dissolution trials by means of written declarations. (*Elkins v. Superior Court, supra,* 41 Cal.4th at p. 1344.) Our Supreme Court concluded the rule was inconsistent with Family Code section 210, which provides that " 'the rules of practice and procedure applicable to civil actions generally . . . apply to, and constitute the rules of practice and procedure in, proceedings under [the Family Code].' " (*Elkins, supra,* at p. 1354.) Because the rules governing civil actions disallow the use of declarations at trial as inadmissible hearsay (subject to statutory exceptions), the use of declarations at dissolution trials must be subject to the same limitation. (*Id.* at p. 1344.)

■ A family law court is empowered to hear motions based upon declarations and to exclude oral testimony. (*Reifler v. Superior Court* (1974) 39 Cal.App.3d 479, 485 [114 Cal.Rptr. 356]; *In re Marriage of Kelso* (1998) 67 Cal.App.4th 374, 384 [79 Cal.Rptr.2d 39]; Cal. Rules of Court, rule 5.118(b).) Although the trial court has discretion to allow oral testimony in appropriate cases, it is not required to do so. (*Reifler v. Superior Court, supra,* at p. 485.)

■ Kathey provides no reason or authority why an attorney fee or sanctions issue is not a "motion" matter. "[C]ourts determine the reasonableness of attorney fees every day by ruling on motions. [Citation.] In those hearings, the court has before it evidence in the form of declarations only, not

live testimony, and detailed billing records are not required to support an award." (*Padilla v. McClellan* (2001) 93 Cal.App.4th 1100, 1106 [113 Cal.Rptr.2d 680]; see, e.g., *In re Marriage of Borson* (1974) 37 Cal.App.3d 632, 636 [112 Cal.Rptr. 432] ["motion" that the husband be ordered to pay the wife's attorneys]; *Armstrong v. Armstrong* (1947) 81 Cal.App.2d 322, 326–327 [183 P.2d 905] [award of attorney fees raised by motion on affidavits]; *Reifler v. Superior Court, supra*, 39 Cal.App.3d at pp. 483–484 [wife's motion for attorney fees could be determined on declarations, subject to trial court's discretion to allow oral testimony].) ■ And " '[T]he scope of a hearing on an application for sanctions is within the trial court's discretion, as with motions generally.' " (*In re Marriage of Petropoulos* (2001) 91 Cal.App.4th 161, 179 [110 Cal.Rptr.2d 111].)

### *Opportunity to Be Heard*

Kathey contends that she was denied a meaningful opportunity to be heard because she had only seven days to respond to Richard's supporting papers. There is no merit to the point. In November 2007, Richard notified Kathey that attorney fees and sanctions were issues in play. He served other papers on Kathey to the same effect in January, April, and August 2008. Kathey stipulated to bifurcate the issue. The trial court's December 2008 statement of decision, which sets the briefing schedule, also flagged the issue. And Kathey filed a 100-page opposition. Though Kathey argues that she did not have sufficient time to properly defend her interests, she fails to explain why this is so in light of the above.

### *Parity in Representation*

Kathey contends that she was denied parity in representation because of a May 12, 2008 order forbidding her from filing any motions, which prevented her from filing a written motion for need-based attorney fees. The point fails because Kathey fails to show prejudice by demonstrating that the trial court would have granted a written need-based attorney fee motion. (*In re Marriage of Falcone & Fyke, supra*, 164 Cal.App.4th at pp. 822–823.)

### *All-purpose Judge*

Kathey contends that the attorney fee and sanctions issue should have been heard by the all-purpose family court judge, Judge Patricia M. Lucas, rather than Judge Cain in civil court. She urges that Judge Lucas was more familiar with the case history. And she claims that she was entitled to continuity. She concedes, however, that Judge Cain had heard one contempt motion in addition to the extensive trial. Thus, Judge Cain was familiar with the case history and there is no apparent prejudice. Moreover, Kathey did not object at

the beginning of trial to Judge Cain hearing the trial. She presented her need-based attorney fee motion to him at the beginning of trial. And she had no objection when Judge Cain confirmed that he would hear the attorney fee and sanctions issue after trial: "So we will bifurcate the issue of attorney's fees and we'll address that posttrial." Kathey has forfeited the issue by failing to timely object. Her belated objections during and after trial were untimely.

*Festering Testimony*

Kathey complains that "Richard was permitted to introduce evidence relative to the 'bifurcated' attorney fees issues and alleged misconduct, during his dissolution trial case-in-chief" and the evidence "was permitted to fester unchallenged for five months with the judge." She neither explains what was the error nor cites authority for the proposition that some error occurred. She has waived the point. (*In re Marriage of Falcone & Fyke, supra,* 164 Cal.App.4th at p. 830.)

*Contempt Matter*

Kathey complains that Judge Cain put her under the impression that she was not due criminal due process protections in the civil contempt issue he led her to believe he was pursuing. She concedes that Judge Cain did not pursue civil contempt proceedings against her but instead referred charges to the district attorney for criminal contempt proceedings. There is no apparent error here.

Kathey mentions in passing that Judge Cain erred by making the attorney fee and sanctions award because she had a "double jeopardy protection against duplicate prosecution for the same offense." But the attorney fee and sanctions issue is not a criminal prosecution.

*Sanctions Award*

Kathey finally argues that the trial court erred in making the award because Richard did not specify any authority. This point is incorrect as we have recounted above. Kathey claims that "the record and order does not establish that the court actually exercised its discretion and followed applicable legal standards" to not award a sanction that imposes an unreasonable financial burden on the party against whom the sanction is imposed. There is no merit to the point. The amended order states that the trial court found that the order would not impose an unreasonable financial burden on Kathey.

## H034869—ORDER CONFIRMING ACCOUNTING AND DISTRIBUTION

*Background*

On April 22, 2009, Richard filed an order to show cause (OSC) seeking authorization to withdraw $700,000 from the Wells Fargo trust account in order to purchase a home, pay attorney fees due for the dissolution proceedings, and pay accounting fees for preparation of the accounting made necessary by the judgment.[6] The OSC noted that Kathey had not yet paid Richard the one-half equity in the family residence as directed by the judgment. It also asked that an attached accounting reflecting the judgment and attorney fee order be confirmed. And it also asked for $5,000 sanctions pursuant to Family Code section 271 (sanctions for party's conduct)[7] because Kathey's failure to pay one-half of the family residence equity "led to the necessity of filing this motion." Richard supported the OSC and sanctions request with his declaration, his attorney's declarations, and an income and expense statement.

Kathey filed an opposition claiming that the trial court did not have jurisdiction because she had appealed from the judgment and the attorney fee order. The opposition and Kathey's supporting declaration also quibbled with some of the accounting and Richard's income and expense statement. Kathey also objected to the sanctions request asserting that she "has made repeated attempts to compromise and settle matters which have mostly been ignored." She also added: "[Richard's] comparative wealth greatly exceeds that of [Kathey]. As noted above, [Kathey] has no ability to pay a sanctions award. Any award of attorney fees, costs and sanctions will represent an unreasonable burden to [Kathey]."

Richard filed a reply declaration noting that Judge Cain had recently rejected Kathey's argument that Family Code section 271 sanctions impose

---

[6] The OSC asked for an ex parte order. Judge Clark denied the ex parte request pending a hearing.

[7] Family Code section 271, subdivision (a), provides: "Notwithstanding any other provision of this code, the court may base an award of attorney's fees and costs on the extent to which the conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys. An award of attorney's fees and costs pursuant to this section is in the nature of a sanction. In making an award pursuant to this section, the court shall take into consideration all evidence concerning the parties' incomes, assets, and liabilities. The court shall not impose a sanction pursuant to this section that imposes an unreasonable financial burden on the party against whom the sanction is imposed. In order to obtain an award under this section, the party requesting an award of attorney's fees and costs is not required to demonstrate any financial need for the award."

an unreasonable burden on Kathey. He argued: "As if it were not enough that [Kathey] has taken every issue to trial and challenged virtually every single trial court ruling she received, [Kathey] is also just choosing not to comply with the Orders either. She has failed to pay [Richard] his one-half equity in [the family residence] and failed to refinance the property." He also pointed out that her opposition to the disbursement of $700,000 was based on the incorrect claim that disbursement was barred because of her pending appeals.

On May 8, 2009, Richard filed an OSC seeking an order transferring the family residence to him, giving Kathey a credit offset of one-half the equity to be held in the Wells Fargo trust account, and confirming the accounting. It also asked for "Sanctions of not less than $15,000" pursuant to Family Code section 271 because Kathey "is in violation of the court's order directly [*sic*] her to pay to [Richard] one-half the equity in the house. Her failure to comply has led to the necessity of filing this motion."

Kathey filed an opposition claiming that the trial court did not have jurisdiction because she had appealed from the judgment and attorney fee order. She again quibbled with the accounting and asserted that she had not paid Richard one-half of the family residence equity because Richard had not paid her the Smith/Ostler "support arrearages." She also objected to the sanctions request asserting that Richard had significant assets and she had a negative net worth. Kathey added that she "ha[d] made repeated attempts to compromise and settle matters which have mostly been ignored." And she objected that Richard did not file and serve an income and expense statement with his sanctions request. Attachment J to her opposition is Richard's income and expense statement dated April 17, 2009.

Judge Cain held a hearing on May 15, 2009. Kathey objected to the accounting on the ground that Richard's Smith/Ostler debt to her was being offset against her debts to Richard. She asserted: "Well specifically what I was asking for was the Smith-Ostler money, the $300,000. And I would like that to be paid to me and then I would like to take that in turn and pay the [family residence] off. I mean he'll in essence be getting the same money and it'll be washing out—." Richard replied that he had run a second accounting that excluded the Smith/Ostler money and the result was similar to the original accounting in the sense that Kathey could not buy him out of the family residence by paying him one-half of the equity. Kathey offered: "If what I'm hearing is out of this entire marriage I walk away with nothing?" To this, Judge Cain remarked: "Very possibly. And, [Kathey], I don't want you even for one instance to treat that as a sudden realization on your part. The only reason I say that is I can speak from personal experience because I cannot tell you how many times I have warned you that this could very well be where we're headed towards. And I mean when I say talked about this I

mean way back when. But nonetheless despite repeatedly warning—and I have no obligation to do that. I'm not here on your behalf. I'm not here on [Richard's] behalf. That's not my job. But nonetheless you have been repeatedly warned that that may very well happen."

Richard then called his accountant as a witness who testified about the accounting that resulted from the judgment and attorney fee order. The accountant offered that Kathey had $1.05 million in the Wells Fargo trust account. The accountant posed that Kathey would owe Richard $1.3 million if Kathey retained the family residence and $710,000 if Richard retained the family residence. The accountant alternatively posed that Kathey would owe Richard $1.66 million (Kathey retaining the family residence) or $1.06 million (Richard retaining the family residence) if the Smith/Ostler money were excluded from the accounting. Richard concluded: "Your honor, what we're requesting is that [Richard] be awarded the [family residence] because [Kathey] blew her deadline. She also failed to get any refinancing. I've never been provided with any documents that she got it done within the 60 days set out in the court's order."

Judge Cain questioned whether he could award Richard the family residence while Kathey's appeal of the judgment was pending. He authorized release of $700,000 to Richard and left the accounting and sanctions issues pending further order. He later concluded that Kathey's appeal precluded him at that time from awarding the family residence to Richard and denied Richard's request.

On August 10, 2009, Richard filed an OSC seeking a decision on the accounting and sanctions. He also asked for release to him of the remaining funds in the Wells Fargo trust account and an award to him of a lien on the family residence representing Kathey's debt to him under the accounting scenario in which Kathey retains the family residence (Kathey has $1.05 million but owes $1.3 million). And he asked for "Sanctions of not less than $20,000."

Kathey filed an opposition that reiterated the points raised in her prior opposition and urged that any final accounting or distribution was premature while her appeals were pending.

Judge Cain held a hearing on August 17, 2009. Richard's accountant testified about certain corrections and changes that she made to the accounting, including the $700,000 credit to Kathey stemming from the release of that amount to Richard. Her conclusion was that Kathey had $355,000 in the Wells Fargo trust account and still owed Richard $652,000. Richard's attorney requested $20,000 in sanctions after explaining that she had worked at least 12 more hours on the OSC since the hearing on May 15, 2009.

Judge Cain confirmed the accounting with minor modifications, released the remaining funds in the Wells Fargo trust account to Richard, and ordered a lien in Richard's favor on the family residence of $297,000 plus $20,000 (for sanctions).

*Trial Court's Jurisdiction*

Kathey contends that the trial court had no jurisdiction over Richard's OSC because the judgment and attorney fee order were stayed pending resolution of her appeals pursuant to the general rule of section 916, subdivision (a). There is no merit to the point.

Section 917.1, subdivision (a)(1), provides that the perfecting of an appeal shall not stay enforcement of a judgment for the payment of money unless an undertaking is given. And section 917.4 provides that the perfecting of an appeal shall not stay enforcement of a judgment directing the conveyance of real property unless an undertaking is given. Richard's OSC sought no more than the payment of money and conveyance of an interest in real property due him under the judgment and attorney fee order. Kathey did not file an undertaking to stay enforcement of the judgment and attorney fee order.

*Support Offset*

Kathey contends that the trial court erroneously offset support arrearages Richard owed to her against debts she owed to Richard. (*Keck v. Keck* (1933) 219 Cal. 316, 319–321 [26 P.2d 300] [allowing offset would amount to impermissible retroactive modification of past due support].) There is no merit to the point.

At trial, Judge Cain made a Smith/Ostler calculation and awarded Kathey additional support pursuant to an existing order that Richard pay additional spousal and child support from his additional income over and above $17,000 monthly. He noted that neither the Smith/Ostler percentage, amount due, nor due date had ever been before determined. There were therefore no arrearages. The Smith/Ostler debt matured with the judgment and accounting.

*Accounting*

Kathey contends that the trial court erred in offsetting the February 18, 2009 sanctions award "against the retirement plan, support, [family residence] and other assets." She claims that the February 18, 2009 order (H034127) orders her to pay sanctions from her portion of the funds in the Wells Fargo trust account. There is no merit to the point.

It is true that Judge Cain ordered Kathey to pay the sanctions "from [Kathey's] portion of the remaining funds" in the Wells Fargo trust account. But he did not order that Kathey pay the sanctions exclusively from the trust account as Kathey would have it. At best, the order is ambiguous. It could mean that the source of payment was to be the trust account and no other; or it could mean that the trust account was a source of payment via an accounting.

■ A court order is interpreted under the same rules for interpreting writings in general. (*Herman Feil, Inc. v. Design Center of Los Angeles* (1988) 204 Cal.App.3d 1406, 1414 [251 Cal.Rptr. 895]; *Verdier v. Verdier* (1953) 121 Cal.App.2d 190, 193 [263 P.2d 57].) The language of a writing governs if it is clear and explicit. But when it is susceptible "to two interpretations, the court should give the construction that will make the [writing] lawful, operative, definite, reasonable and capable of being carried into effect and avoid an interpretation which will make the [writing] extraordinary, harsh, unjust, inequitable or which would result in absurdity." (*Ticor Title Ins. Co. v. Rancho Santa Fe Assn.* (1986) 177 Cal.App.3d 726, 730 [223 Cal.Rptr. 175].) Subsequent actions by the rendering judge may be considered as bearing upon the judgment's intended meaning and effect. (See *Verdier v. Verdier, supra*, at pp. 192–193.)

Here, Kathey's interpretation of the sanctions order makes the order extraordinary, harsh, unjust, inequitable, and absurd. It places a limit on her financial liability while allowing unlimited freedom to continue the behavior that justified sanctions once the financial limit is reached. It would have the effect of rendering future sanctions orders meaningless once the financial limit is reached. Judge Cain's contemporaneous interpretation of the order as allowing Richard a lien on Kathey's other assets because Kathey had exhausted her interest in the trust account also supports that the meaning of the sanctions order is that the trust account was a source for the sanctions payment rather than the only source.

*Amount of the Lien*

Kathey complains that the trial court was not authorized to award a lien of $297,000 and sanctions of $20,000 against all her assets because Richard's "pleadings only requested a [$218,000] and $20,000 lien against the [family residence]." There is no merit to the complaint.

The entire point of the hearing at issue was an accounting, an issue that is necessarily fluid rather than fixed at the time of a pleading. In any event, Richard's pleading did not ask for a specific amount of lien against the family residence only. Richard's OSC asked that the "calculations be confirmed by

the court as the appropriate accounting under the judgment and sanction order [and] that the Wells Fargo funds be distributed to [Richard] and a lien issue for the remainder of the sums due [Richard] from [Kathey]." Kathey's record references for her complaint refer to the declarations of Richard and his attorney in support of the OSC. Those declarations were necessarily subject to the accounting prove-up that Richard submitted via his expert witness.

*Sanctionable Behavior*

■ Kathey contends that Richard did not submit a description of the conduct that constituted sanctionable behavior. There is no merit to the point. Richard's papers identified the following: the judgment required Kathey to pay Richard one-half of the equity in the family residence; Kathey failed to do so; and Richard was therefore compelled to enforce the judgment. That Judge Cain declined to enforce the judgment by ordering an outright convey-ance does not negate that Kathey's refusal to comply with the judgment compelled Richard to seek a remedy.

Kathey finally maintains that Judge Cain failed to consider the parties' "comparative wealth." There is no merit to the point.

Judge Cain specifically acknowledged being familiar with "the assets and debts of the parties" and found that an award of $20,000 sanctions "is appropriate and will not impose an unreasonable burden on [Kathey]."

■ Kathey complains that Richard failed to serve a current income and expense statement with his motion for sanctions. There is no merit to the claim. "Because [Family Code] section 271 is not a need-based statute and does not require a correlation between the sanctioned conduct and specific attorney fees, it was not essential that [Richard] demonstrate [his] current financial situation and attorney fees by submitting an income and expense declaration." (*In re Marriage of Corona* (2009) 172 Cal.App.4th 1205, 1226–1227 [92 Cal.Rptr.3d 17].)

(14) Kathey finally complains that the award was excessive because the hourly rate times hours worked by Richard's attorney computes to $8,000 rather than $20,000. We reject the point. "[A] sanctions award under [Family Code] section 271 need not 'be limited to the cost to the other side resulting from the bad conduct.' " (*In re Marriage of Corona, supra*, 172 Cal.App.4th at p. 1226.) In other words, a party requesting a Family Code section 271 award is not required to show any financial need for the award or any actual injury. (*In re Marriage of Corona, supra*, at p. 1225.) The only stricture is that the sanction may not impose an unreasonable financial burden on the party sanctioned. (*Id.* at p. 1226.) The sanction simply authorizes a penalty for

obstreperous conduct. (*Robert J. v. Catherine D.* (2009) 171 Cal.App.4th 1500, 1520 [91 Cal.Rptr.3d 6].) Thus, it is of no moment whether some of the sanctions can be pigeonholed outside of Richard's costs that directly resulted from Kathey's conduct.

### H035337—SANCTIONS ORDER FOR APPEALING A SANCTIONS ORDER[8]

*Background*

On August 10, 2009, Richard filed an OSC seeking attorney fees and costs pursuant to Family Code section 271. He sought fees and costs charged him by appellate counsel ($30,000) and trial counsel ($5,792) for defending two appeals: *In re Marriage of Falcone & Fyke* (May 1, 2009, H032396) (nonpub. opn.)—appeal from an order denying reconsideration of a prior order denying attorney fees; and *In re Marriage of Falcone & Fyke* (May 1, 2009, H032482) (nonpub. opn.)—appeal from an order awarding $23,680 in sanctions pursuant to Family Code section 271. In an opinion filed on May 1, 2009, we dismissed the appeal in *In re Marriage of Falcone & Fyke, supra,* H032396 because it was from a nonappealable order. And we affirmed the order in *In re Marriage of Falcone & Fyke, supra,* H032482. We issued a remittitur for each case on July 1, 2009.

Richard attached billings from each attorney. Richard's appellate attorney generally declared that he had worked 60 hours on the appeals at the rate of $500 per hour and Richard's trial attorney generally declared that she, an associate, and a paralegal had consulted with appellate counsel at $450, $225, and $175, respectively, per hour and she had incurred various costs.

Richard's papers pointed out that Kathey had by then filed 15 appellate proceedings, four of which were pending, nine of which resulted in denial of relief, and two of which resulted in a dismissal. They added that the appeals in question were without merit, unnecessary, and increased litigation costs. They argued that a sanctions award would not be an unreasonable burden on

---

[8] Some of Kathey's points raised in this appeal pertain to challenges that she made below via a motion to tax costs on appeal—Richard had filed a cost memorandum with his motion for sanctions after the remittitur for the underlying appeal had issued. But Kathey did not appeal from an order denying her motion to tax costs. We therefore do not address the points that arise from the motion to tax. We also overlook other points Kathey makes that arise from her general complaints rather than a specific ruling or order. An example of this category of complaint is Kathey's "impression that she was not due [criminal contempt] protections" in the event the trial court pursued civil contempt proceedings against her and belief that the trial court was pursuing civil contempt proceedings against her until the trial court referred the matter to the district attorney.

Kathey given that she had an interest-bearing trust account of $351,000 from the sale of the Saratoga real property.

Kathey's papers principally argued that the claimed fees had nothing to do with the appeals and had already been awarded by the trial court in a postjudgment order.

At the OSC hearing heard by Judge L. Michael Clark, Richard submitted an updated income and expense declaration and noted that Kathey had filed a 16th appellate proceeding. He then submitted the matter. Judge Clark summarized that Kathey was arguing that some of the claimed fees and costs were "in essence double-dipping because they've already been paid before" and "sanctions on [her] would pose an unreasonable financial burden."[9] He then noted that the supporting papers pertained to fees and costs incurred in 2009 but both appeals were fully briefed in December 2008. He also observed that it was difficult to tell whether appellate counsel's invoices had distinguished between the two appeals in question and the other appeals he was handling though it noted that appellate counsel had acknowledged the difficulty in isolating the appellate services. He inquired of Richard's trial counsel whether there was information regarding Kathey's "current financial circumstances that would indicate if she has any assets whatsoever that can be used to pay a sanction" and learned that Kathey had $300,000 equity in her residence and a $334,000 interest in Richard's pension. Kathey argued the following: "Back in February 19th 2009, Judge Cain awarded [Richard] every dime that [appellate counsel] and [trial counsel] asked for, a total of 833,000, almost a million dollars. At that time [appellate counsel] had included all of his costs on these two appeals, all of his briefing on these two appeals, the only item, you know, that was out there was oral argument."

Judge Clark awarded Richard $20,000 for appellate counsel and $5,792 for trial counsel. He explained: "And in reading the decision of the Sixth District Court of Appeal filed on May 1st, 2009, the only conclusion the court can draw is that there were no meritorious arguments in filing your appeals. You did so without any consideration of the costs upon parties to this case or possibility of success or the merits. And in reading through the papers, it looks like you filed 15 appeals so far. At least every appeal that's been decided you've lost. And so the sense I get is that you think that you can simply file appeals, and if you lose, there's no downside. And there is a downside when you're filing appeals in the civil court. And so in this case you've greatly increased the cost of litigation by filing additional meritless appeals, and the court finds that sanctions are both proper and necessary in this case. [¶] The issue, the real issue in my mind is whether imposing

---

[9] When Kathey clarified that those were "her two main" arguments, Judge Clark acknowledged that she had made "about 17 [other] arguments" in her papers that he had considered.

sanctions would constitute an unreasonable financial burden on you because I have conducted many fee waiver hearings for you. When I say many, probably a handful, maybe three or four. I don't know if that's an exact number, but you've been in front of me on multiple occasions on the fee waiver calendar, and you've indicated to me that you have no money. I've indicated to you at some of those hearing that I had some concerns about the reliability of the financial information that you've provided. I feel like today I've received some additional information, and I have read and considered the income and expense declarations submitted by both parties. . . . [¶] . . . [A]nd I'm accepting as true your representation that you're not employed. It doesn't look like you have any money left in the Wells Fargo Trust Account because of previous court orders. But it does appear that you continue to own real estate here in Santa Clara County, and that if we take the fair market value of the property as determined by Judge Cain as recently as August of this year, it looks like—it looks like we have a piece of property somewhere in the neighborhood of $690,000 in value. And we've got some encumbrances there, but looks to be several hundred thousand dollars in equity there. In looking at your income and expense declaration, you list roughly $7,000 in expenses per month, and you've indicated to me that that's . . . estimated. But if you're incurring anywhere near those expenses or even half those expenses, then I would expect to see that listed somewhere in terms of credit card debt, recent credit card debt, that you'd essentially be burning through anywhere from 3 or 4,000, $7,000 a month in expenses, but that's not showing up anywhere. So, again, I think I've talked to you at previous hearings that I have some concern about those sort of expenses when there's no, apparently no income or debt associated with that. So at this time I find that it would not place an unreasonable financial burden upon you to impose reasonable sanctions in this case . . . . [¶] . . . Court finds that the attorney's fees declaration and the billing statement are believable and consistent with the Court's own sense of how much it costs the primary attorney in a case to monitor an appeal and motions related to the appeal in a case like this."

*Discussion*

Kathey contends that Richard's OSC was untimely. She relies on California Rules of Court, rule 3.1702(b)(1), which states that a notice of motion to claim statutory or contractual attorney fees "for services up to and including the rendition of judgment in the trial court—including attorney's fees on an appeal before the rendition of judgment in the trial court—must be served and filed within the time for filing a notice of appeal [from the judgment—generally within 60 days]." According to Kathey, since both appeals were from prejudgment orders and the judgment was filed on February 11, 2009, Richard's OSC filed on August 10, 2009, was untimely. There is no merit to this point.

Richard did not file a motion for statutory attorney fees regarding an appeal before the rendition of judgment. He filed a motion for sanctions regarding an appeal that constituted " 'obstreperous conduct which frustrated the policy of the law in favor of settlement, and caused the costs of the litigation to greatly increase.' " (*In re Marriage of Freeman* (2005) 132 Cal.App.4th 1, 6 [33 Cal.Rptr.3d 237].) By definition, the right to sanctions did not arise until we issued our remittitur on July 1, 2009. The cited rule is patently inapplicable.

Kathey next repeats her double-dipping argument. She contends that the evidence is insufficient to support the sanctions award because "Richard was not entitled to a second award of fees, that had already be[en] adjudicated." She apparently relies on Judge Clark's observation that the two appeals in question were fully briefed in 2008 and trial counsel's acknowledgement that Judge Cain had made a postjudgment award in 2009 for attorney fees incurred by Richard through 2008. Kathey's analysis is erroneous.

The fees that Richard outlined in his OSC pertained to 2009. Thus, there was no double dipping. It is true, as observed by Judge Clark, that it is difficult to identify some of the 2009 billing entries as pertaining to the appeals in question. Thus, at most, Kathey's complaint is that Judge Clark awarded fees for attorney work that was not attributable to the appeals in question. But Judge Clark accounted for this by awarding $20,000 instead of the requested $30,000.

In any event, Kathey's argument as to the lack of supporting evidence fails because, as we have mentioned, "a sanctions award under [Family Code] section 271 need not 'be limited to the cost to the other side resulting from the bad conduct.' [Citation.] . . . [It] does not require a correlation between the sanctioned conduct and specific attorney fees . . . ." (*In re Marriage of Corona, supra*, 172 Cal.App.4th at p. 1226.)

Kathey finally maintains that Judge Clark failed to consider the parties' "comparative wealth." There is no merit to the point.

Here, Judge Clark specifically acknowledged considering the income and expense statements of both parties. And he specifically discounted Kathey's statement to the extent that the statement suggested impecuniousness. And he had before him Judge Cain's findings that showed Kathey owning several hundred thousand dollars in real estate equity. Though Kathey now disputes what is the fair market value of her real estate, she neither made this point below nor disputes that she has real estate equity. In any event, it is beyond dispute that Judge Clark took into consideration all evidence concerning the parties' incomes, assets and liabilities.

A trial court has broad discretion under Family Code section 271 to award sanctions against a party who frustrates the policy to promote settlement and cooperation in family law litigation. The only stricture imposed by this statutory provision is that the sanctions may not impose an unreasonable financial burden on the party sanctioned, although the court must take into consideration all evidence concerning the parties' incomes, assets and liabilities. (*In re Marriage of Corona, supra,* 172 Cal.App.4th at p. 1226.)

"A sanctions order under [Family Code] section 271 is reviewed for abuse of discretion. ([*In re Marriage of*] *Feldman* [(2007)] 153 Cal.App.4th [1470,] 1478 [64 Cal.Rptr.3d 29].) Accordingly, we will overturn such an order only if, considering all of the evidence viewed most favorably in its support and indulging all reasonable inferences in its favor, no judge could reasonably make the order." (*In re Marriage of Corona, supra,* 172 Cal.App.4th at pp. 1225–1226; see *In re Marriage of Eben-King & King* (2000) 80 Cal.App.4th 92, 122 [95 Cal.Rptr.2d 113] [court has broad discretionary authority under Fam. Code, § 271].) " 'We review any findings of fact that formed the basis for the award of sanctions under a substantial evidence standard of review.' " (*In re Marriage of Corona, supra,* at p. 1226, quoting *In re Marriage of Feldman, supra,* at p. 1479.)

Kathey manifestly fails to demonstrate an abuse of discretion.

### H036368—PREJUDGMENT ORDER AWARDING SANCTIONS

*Background*

"At a trial setting conference in January 2008, before Judge Thomas William Cain, the parties were set for a two-week trial commencing May 12, 2008. The parties were given a copy of Judge Cain's 'Trial Statement,' which was to be filed by noon on the Friday preceding the trial; i.e., May 9, 2008. This 'Trial Statement' included an admonition that, absent unusual circumstances, the court was reluctant to continue the trial.

"In April 2008, Kathey filed a motion to continue the trial date, which motion was eventually set for hearing on May 6, 2008, before Judge Patricia M. Lucas. The day before the hearing, Kathey telephoned Judge Lucas's clerk and 'reported that she had just been released from the hospital, did not feel well, and would not be attending the hearing the following day.' She offered to provide documentation from her physician and was directed to fax those documents to both Richard's counsel and the court. Kathey faxed a copy of a note from a 'K. Welter MD' on Camino Medical Group letterhead, which read in its entirety: 'Kathy [*sic*] Fyke cannot participate in the court

dates starting 5/9/08, due to medical illness. Please postpone.' On the cover sheet, Kathey wrote that she would also be unable to attend the hearing on May 6, 2008, and advised that if a second note was required to excuse her absence from that hearing, the clerk should call and leave her a message.

"Because the physician's note only addressed 'court dates starting 5/9/08,' Judge Lucas's clerk called Kathey and advised her that the May 6, 2008 hearing would remain on calendar. Kathey faxed a second note, again signed by 'K. Welter MD,' which stated 'Kathy [*sic*] Fyke cannot be present at any court dates between now and June 2, 2008 due to illness.' This note appears to have been received by the court after hours on May 5, 2008.

"After receiving a copy of the physician's note from Kathey, Richard's counsel faxed Dr. Welter on May 5, 2008, asking that Dr. Welter authenticate the note, but Dr. Welter did not respond to that fax.

"Notwithstanding the notes from Kathey's physician, the May 6, 2008 hearing was not continued and Kathey personally appeared. When the parties were asked to state their appearances on the record, the following exchange took place between Kathey and Judge Lucas:

" '[KATHEY]: Kathey Fyke. And I'd like to say I'm on a total of five different medications right now. I'm here against doctor's orders. [¶] I'm not sure what has happened. I sent two notices from my doctor about me not participating today. I offered whatever else the Court needed.

" 'THE COURT: Why don't you have a seat, please.

" '[KATHEY]: I'm extremely ill, and as a matter of fact I'm taking some nitroglycerin right now. And I would appreciate it if the Court could continue this, because I cannot continue. I'd like to take this pill and then call 911.

" 'THE COURT: Would you have a seat, please, Ms. Fyke.

" '[KATHEY]: In a minute.

" 'THE COURT: Would you have a seat, please, Ms. Fyke.

" '[KATHEY]: Can you give me a minute to take this, please.

" 'THE COURT: Ms. Fyke, I would like you to have a seat, please. Would you do that?

" '[KATHEY]: Can you give me ten seconds?

" 'THE DEPUTY: Ms. Fyke, would you please have a seat.

" '[KATHEY]: Just a minute, Your Honor. I just dropped the pills.

" 'THE COURT: Ms. Fyke, I would like you to sit down, please.

" '[KATHEY]: I will. I will, Your Honor.

" 'THE DEPUTY: Ma'am, could you please have a seat.

" 'THE COURT: Ms. Fyke.

" '[KATHEY]: I need to take a pill.

" 'THE COURT: You can sit down.

" '[KATHEY]: They're all falling out.

" 'THE DEPUTY: Please sit down. Sit down and clean it up, please.

" '[KATHEY]: Your Honor, I need to go. I need to—I'm—I apologize. I'm not feeling well. I'm in distress right now. I'm supposed to call 911. Could I please—I'm not feeling well. [¶] My doctor gave you her phone number if you wanted to confirm with her. I don't understand why I had to be drugged [*sic*] through this. I had a lot—

" 'THE COURT: This is a hearing on the Respondent's motion to continue the trial.

" '[KATHEY]: And I should have—

" 'THE COURT: Is that matter submitted?

" 'MS. YATES-CARTER: Yes, Your Honor.

" '[KATHEY]: And I should have an opportunity to, um, to address it and deal with—and I gotta go, Your Honor. I'm sorry.

" 'THE COURT: Do you—

" '[KATHEY]: Can I please be excused?

" 'THE COURT: Do you want to submit this matter for decision?

" '[KATHEY]: No. [¶] I've got other information I wanted to share with you about the status of the computer.

" 'THE COURT: Could we have the parties sworn, please.

" 'THE CLERK: Please stand and raise your right hand.

" '[KATHEY]: I'm not doing this, Your Honor. I'm sorry. I've asked for whatever is there, um, I apologize, um, I can't. You're welcome to call my doctor, but I, um, I'm having severe chest pains. The nitro's not kicking in and, um, I need to go take care of this. I apologize.

" 'THE COURT: Okay. Can I—can I get—Ms. Fyke.

" '[KATHEY]: Could you—do you have emergency—

" 'THE DEPUTY: Are you telling me you have chest pains right now, strong chest pains?

" '[KATHEY]: The nitro didn't—

" 'THE DEPUTY: Would you like me to call 911? I don't want you to fall over. Sit down.

" 'THE COURT: Ms. Fyke, would you cooperate, please cooperate with the Deputy and sit down. [¶] Ms. Fyke, cooperate with the Deputy and sit down.

" 'THE DEPUTY: Do you want me to call emergency medical assistance, 911? [¶] Ms. Fyke, do you need emergency medical assistance?

" '[KATHEY]: I want to call my doctor.

" 'THE DEPUTY: Do you want me to call 911, yes or no?

" '[KATHEY]: I'm sorry. I'm not doing this. I'm sorry.'

"The transcript then reflects that Kathey left the courtroom.

"On May 7, 2008, Judge Lucas issued an order denying Kathey's motion to continue the trial. In her order, Judge Lucas noted that neither of the physician's notes Kathey provided prior to the hearing date included any information 'concerning physical or other limitations that would preclude [Kathey]'s participation.' She also indicated that, at the hearing, Kathey said

she needed to take her pills before she could sit, but failed to explain why she waited until the matter went on the record to take those pills. Judge Lucas's order also noted that Kathey had failed to cooperate with the deputy sheriff and did not answer his question about whether she wanted emergency medical assistance. The court concluded that Kathey had failed to show good cause to continue the trial based on either the grounds raised in her initial written motion, i.e., that Richard had deprived her of access to a computer, or with respect to the 'alternative basis [Kathey] now apparently asserts, i.e., that she is medically unable to proceed with trial.' The order states that Kathey provided no declaration or sworn testimony regarding any supposed medical limitations and the physician's notes that were provided were neither sworn nor authenticated.

"The order noted that Kathey's 'physical appearance [at the hearing] . . . was no different than at previous court appearances, and her claim of medical incapacity is inconsistent with her own conduct at that hearing. . . . If [Kathey] were experiencing serious medical difficulties, she would have accepted the offer to call 911 and to summon emergency medical assistance, rather than walk briskly out of the courtroom on her own power, repeating "I'm not doing this." [¶] What the Court saw and heard is more consistent with a litigant who wants to prevent the proceedings from going forward, which has been [Kathey]'s practice throughout this litigation. [Kathey] has long resisted bringing this matter to trial. The case is now over four and a half years old, the trial court file is now in eighteen volumes, and [Kathey] has initiated eleven appellate proceedings. Those proceedings have caused delay in the trial court.'

"On May 7, 2008, after receiving a copy of Judge Lucas's order, Judge Cain's clerk telephoned the parties to remind them that their 'Trial Statements' must be filed by noon on May 9, 2008. At that time, Kathey informed the clerk that she would not appear at trial, making 'vague references to heart surgery, and having just left the hospital.'

"Judge Cain's clerk left telephone messages for Kathey's physician, who returned the call on the morning of May 9, 2008. The physician explained that she [had seen] Kathey on May 2, 2008, and that Kathey had an angioplasty the following day, which included placing stents in two coronary vessels. Kathey was initially released from the hospital on May 4, 2008, but returned on May 6, 2008 and was released again on May 7, 2008. Judge Cain asked that the physician put this information in writing and fax it to the court, and directed his clerk to notify Richard's counsel of the need to address a potential continuance request at the outset of trial on May 12, 2008.

"On May 12, 2008, the parties stated their appearances and Judge Cain indicated that Kathey, who was appearing by telephone, had requested a

continuance. Richard's counsel opposed that request, arguing that Kathey had been consistently trying to continue the trial and expressing doubts about the 'validity of this last-moment plea.'

"Judge Cain granted the request for a continuance, principally due to the new information he had learned from Kathey's physician, and reset the matter for trial on August 11, 2008. The judge expressed his 'concerns about how much of [the inconvenience and expense] could have been avoided had Ms. Fyke simply just provided [Judge Lucas] with some additional information last Monday. . . . Because had Judge Lucas had this information, her outcome might have been different in which case you might have headed off at least some of the expense and people and everything else that you've since had to incur subsequently.' He further acknowledged that Richard had been inconvenienced and had incurred undue expense in preparing for trial, and invited Richard's counsel to submit 'by declaration or otherwise the expense and cost that you believe you've incurred between . . . Monday and Friday at 9:00.'

"The trial court then proceeded to discuss calendaring a new trial date, as well as resetting the hearings on two pending motions that Kathey had filed, both of which were set for hearing *after* the originally scheduled trial. Richard's counsel requested that the court continue those motions until after any new trial, and prohibit Kathey from filing any more motions pending trial.

"When the court asked for Kathey's response to the requests made by Richard's counsel, the following colloquy took place:

" '[KATHEY]: Your Honor, with all due respect, I—I'm trying to do my best here. I'm not supposed to be doing this. And, again, I'm on medications. I do not understand 100 percent of what I'm saying. This also goes to this statement about what you said a little earlier about her putting together what—how much she spent.

" 'THE COURT: Right.

" '[KATHEY]: I would love an opportunity to address that.

" 'THE COURT: Okay.

" '[KATHEY]: But the whole point of it is I'm not in a position to address it today.

" 'THE COURT: Why not?

" '[KATHEY]: So—

" 'THE COURT: Why not?

" '[KATHEY]: Because I feel like crap, Your Honor. And I'm trying to explain to you that with these meds—I threw up. [¶] Number one, [Richard's counsel] isn't telling [the] truth.

" 'THE COURT: What isn't she telling the truth about?

" '[KATHEY]: The one that has to do with an order that was rewritten that needs to be rewritten. It's got nothing to do with—with the trial. The second thing, [Richard] is in contempt of quite a few things. And I have to say this, Your Honor: I—[Richard] is in violation of the standard restraining order, took away my health insurance, so he was a contributor in this mess. Even a month ago, I wrote and said hey, my insurance. I need this paid for. And he wouldn't do it. I'm rambling. I have no idea what I'm saying. And I would be glad to pick this up in a month.

" 'THE COURT: All right.'

"Following this exchange, the court proceeded to set a new trial date. There was no further discussion of the issue of sanctions.

"On May 14, 2008, Richard's counsel submitted a declaration and itemization of services performed in preparation for trial in support of Richard's request for fees and costs under [Family Code] section 271. According to the itemized statement, Richard's counsel billed a total of $16,284 in the week prior to the originally scheduled trial.

"On May 15, 2008, Judge Cain issued a written order imposing $16,284 in fees, costs and sanctions against Kathey under [Family Code] section 271, subdivision (a). In that order, Judge Cain specifically noted that Kathey, despite many opportunities, failed to 'provide any details, or chronology of events, as to her medical situation (even when Judge Lucas attempted to elicit such information from her at the time of the May 6, 2008, hearing, as noted at length in her opinion), to either the undersigned, his Clerk, counsel for the Petitioner or Judge Lucas,' and expressly found that '[Kathey]'s failure . . . unnecessarily increase[d] the cost of litigation to [Richard].'

"On July 14, 2008, Kathey filed separate 'objections' to Judge Lucas's May 7, 2008 order denying her request for continuance and Judge Cain's May 15, 2008 order awarding fees, costs and sanctions, along with declarations and supporting exhibits. That same day, she filed a notice of appeal

from the May 15, 2008 order." (*In re Marriage of Falcone & Fyke* (Jan. 26, 2010, H033156) [nonpub. opn.].)

We held that Kathey was afforded neither adequate notice nor a meaningful opportunity to be heard on the request for sanctions and reversed the order. We nevertheless observed the following: "[W]e wish to make clear that our disposition in this case should in no way be read as an endorsement of Kathey's conduct below. Like the sanctioned party in [the case of *In re Marriage of Quinlan* (1989) 209 Cal.App.3d 1417 [257 Cal.Rptr. 850]], Kathey 'waste[d] precious judicial resources, cause[d] needless expense to the taxpayers as well as the opposing party . . . [and] deserve[d] substantial sanctions.' (*Quinlan, supra,* 209 Cal.App.3d at p. 1422.) With adequate notice and an opportunity to be heard on the subject, Kathey could still properly have been found to have unnecessarily increased the costs of litigation and been ordered to reimburse Richard for the portion of his fees and expenses that were needlessly incurred." (*In re Marriage of Falcone & Fyke, supra,* H033156.)

On remand, Richard filed a motion seeking $16,284 in sanctions pursuant to Family Code section 271. He also asked for an additional $7,275 for the costs of making the motion. Kathey filed a response, Richard filed a reply, and Judge Clark held a hearing. At the hearing, Kathey argued that the claimed sanctions duplicated the sanctions Judge Cain awarded in the judgment. In supplemental briefing, Richard acknowledged receiving $16,284 on account of the underlying order that had been reversed, not on account of the judgment. Judge Clark granted Richard's motion to the extent of $16,275. He explained as follows.

"Judge Cain found previously that [Kathey's] conduct in failing to timely provide sufficient information to support her continuance request constituted sanctionable conduct under [Family Code section] 271. Looking at the record anew, there appears no reason to diverge from Judge Cain's conclusion (as well as that of the Court of Appeal), at least as to the finding that [Kathey] engaged in conduct which violates the policy of the law as described in Family Code [section] 271. As detailed above in the factual portion of this order, [Kathey] had two opportunities to justify her continuance request—one before Judge Lucas at the hearing on 5/6/08, and one before Judge Cain either before or at the commencement of the trial on 5/12/08. [¶] Before Judge Lucas, [Kathey] created a spectacle in the courtroom rather than actually participate in the hearing on her own motion. Indeed, Judge Lucas could not even convince [Kathey] to take a seat, let alone elicit enough information to understand [Kathey's] medical concerns or basis for continuance. For some unknown reason, [Kathey] waited until the case was called and on the record before she finally decided to take the nitroglycerin pills.

When Judge Lucas attempted to proceed with the hearing despite [Kathey's] disobedience, [Kathey] refused to be sworn and provide testimony regarding either her medical condition or the trial continuance, even though she stated she had additional information to provide. Although she claimed to be in serious medical distress, she declined multiple offers to summon emergency assistance and walked out of the courtroom on her own power before the hearing ended. The transcript makes it abundantly clear that [Kathey], having had her prior request to continue the hearing denied, had no intention of meaningfully participating or cooperating with the Court when she appeared. She was determined to obtain a continuance of that hearing in any way possible, even if to do so required her to make a scene. In short, [Kathey's] behavior at this hearing was, as Judge Lucas described in the ensuing order, 'more consistent with a litigant who wants to prevent the proceedings from going forward, which has been [Kathey's] practice throughout this litigation.' [¶] Before Judge Cain, [Kathey] again failed to supply the Court information necessary to determine whether her medical issues justified a continuance of the trial. Instead, Judge Cain was forced to himself investigate [Kathey's] medical claims. By the time of the hearing before Judge Cain on 5/12/10 [Kathey] still had not provided any additional information concerning her medical condition. [¶] [Kathey] provides no reasonable explanation for this behavior in her responsive declaration, instead attempting to suggest that it was caused by Judge Lucas'[s] failure to acknowledge her apparent medical issues. The record, of course, belies this claim. [Kathey] was already aware the Court required more information to determine whether she [*sic*] her alleged medical complications did actually exist from her conversation with Judge Lucas'[s] clerk, and instead of attending either of the hearings prepared to supply more information to the Court, she was insolent. The fact that [Kathey] may have been admitted to the emergency room after the hearing before Judge Lucas or may have been on medication is no excuse. Her conduct was completely unacceptable—in every sense of that word—and it caused [Richard] to incur unnecessary fees."

Judge Clark then rejected Kathey's argument that an imposition of sanctions against her would impose an unreasonable financial burden. He observed that Kathey's income and expense statement that claimed no assets and zero income while disclosing $4,700 per month in expenses was not credible. And he also observed that Kathey had assets of at least one-half interest in Richard's retirement accounts (valued at $685,000) and a $300,000 interest in the family home. It also posed that the issue of unreasonable financial burden appeared to be moot given that Richard had already been paid the sanctions.

*Discussion*

Kathey does not challenge Judge Clark's order as an abuse of discretion, except to the extent she disagrees with it. Instead, she offers a cornucopia of complaints. Those that are arguably cognizable are patently without merit or barely coherent. For example:

Kathey repeats complaints that we have previously rejected in similar contexts—e.g., Richard failed to submit an income and expense statement with his sanctions motion, the trial court failed to render a statement of decision on the sanctions motion, and the trial court failed to consider the comparative wealth of the parties.

Kathey quibbles with adverse factual determinations—e.g., the trial court failed to credit her income and expense statement, her behavior did not rise to the level of sanctionable conduct, and Richard mischaracterized her assets.

Kathey misrepresents the record—e.g., the trial court failed to consider "whether the sanction would impose an unreasonable financial burden on Kathey," and she did not request a continuance from Judge Cain.

Kathey urges irrelevancies—e.g., Judge Clark should have asked Kathey questions about her income and expense statement if he was not satisfied, and Judge Clark erred by expressing that the unreasonable-burden issue might be moot.

Kathey claims that something is what it is not—e.g., the sanctions motion was a trial and, thus, the trial court erred when it overruled her hearsay objection to Richard's proof via counsel's declaration.

 "The purpose of requiring headings and coherent arguments in appellate briefs is to 'lighten the labors of the appellate [courts] by requiring the litigants to present their cause systematically and so arranged that those upon whom the duty devolves of ascertaining the rule of law to apply may be advised, as they read, of the exact question under consideration, instead of being compelled to extricate it from the mass.' " (*Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830–1831, fn. 4 [41 Cal.Rptr.2d 263]; see also Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2011) ¶ 9:21, p. 9-6 (rev. # 1, 2011) ["appellate court can treat as *waived* or *meritless* any issue that, although raised in the briefs, is *not supported by pertinent or cognizable legal argument or proper citation of authority*"].)

The issues that Kathey raises in this appeal have been decided against her elsewhere in this opinion or are waived. At best, Kathey's brief discusses evidence favorable to her while ignoring the evidence that supports the order from which she appeals.

## VEXATIOUS LITIGANT

■ Under sections 391 and 391.7, we have the power to declare certain self-represented parties vexatious litigants and "enter a prefiling order [prohibiting them] from filing any new litigation in the courts of this state in propria persona without first obtaining leave of the presiding justice or presiding judge of the court where the litigation is proposed to be filed," on penalty of contempt of court. (§ 391.7, subd. (a); see § 391, subd. (b); *In re R.H.* (2009) 170 Cal.App.4th 678, 691–693 [88 Cal.Rptr.3d 650] [holding vexatious litigant law applies to appellate filings and citing cases].) A "vexatious litigant" includes a person who "[i]n the immediately preceding seven-year period has commenced, prosecuted, or maintained in propria persona at least five litigations other than in small claims court that have been . . . finally determined adversely to the person . . . ." (§ 391, subd. (b)(1).) The vexatious litigant statute is designed not only to protect opposing parties harassed by meritless lawsuits, but also to conserve court time and resources and protect the interests of other litigants who are waiting for their legal cases to be processed through the courts. (*In re R.H., supra*, at p. 696.)

In light of Kathey's persistent pattern of behavior, we have ordered her to show cause why the court should not declare her a vexatious litigant pursuant to section 391, subdivision (b)(1), and issue a prefiling order against her pursuant to section 391.7. Having considered her response, we now find that she is a vexatious litigant within the meaning of section 391, subdivision (b)(1).

Kathey meets the definition of a vexatious litigant provided in section 391, subdivision (b)(1), in that, in this court alone, in the immediately preceding seven-year period she has commenced, prosecuted, or maintained in propria persona at least five litigations that have been finally determined adversely to her as follows:

*In re Marriage of Falcone & Fyke* (Mar. 22, 2007, H029424) (nonpub. opn.), appeal from order denying attorney disqualification motion, affirmed on March 22, 2007;

*Fyke v. Superior Court* (Oct. 5, 2006, H030599), petition for writ of mandate challenging denial of motion to quash, summarily denied on October 5, 2006;

*In re Marriage of Falcone & Fyke* (Aug. 16, 2007, H029924) (nonpub. opn.), appeal from judgment of dissolution, affirmed on August 16, 2007;

*In re Marriage of Falcone & Fyke, supra*, 164 Cal.App.4th 814, appeal from denial of attorney fees and contempt motions and grant of sanctions, affirmed on July 8, 2008;

*Fyke v. Superior Court* (July 2, 2007, H031706), petition for writ of mandate challenging order compelling sale of real property, summarily denied on July 2, 2007;

*In re Marriage of Falcone & Fyke, supra*, H031458, appeal from denial of attorney fees motion, affirmed on March 5, 2009;

*In re Marriage of Falcone & Fyke* (Mar. 5, 2009, H031792) (nonpub. opn.), appeal from denial of attorney fees motion, affirmed on March 5, 2009;

*In re Marriage of Falcone & Fyke* (May 19, 2008, H031892), appeal from order setting the date of separation, dismissed for failure to file opening brief on May 19, 2008;

*In re Marriage of Falcone & Fyke, supra*, H032396, appeal from denial of reconsideration of attorney fees motion, dismissed as from a nonappealable order on May 1, 2009;

*In re Marriage of Falcone & Fyke, supra*, H032482, appeal from grant of sanctions, affirmed on May 1, 2009;

*In re Marriage of Falcone & Fyke* (May 28, 2010, H033619) (nonpub. opn.), appeal from denial of attorney fees, affirmed on May 28, 2010.

And Kathey has prosecuted the within five appeals. The appeals are not yet final within the meaning of the vexatious litigant statutes but they demonstrate that Kathey continues to subject litigation opponents and this court to groundless claims.

Kathey has repeatedly misused the courts of this state. Her misuse has impacted other litigants and this court. " 'Other appellate parties, many of whom wait years for a resolution of bona fide disputes, are prejudiced by the useless diversion of this court's attention. In the same vein, the appellate system and the taxpayers of this state are damaged by what amounts to a waste of this court's time and resources.' " (*In re Whitaker* (1992) 6 Cal.App.4th 54, 57 [8 Cal.Rptr.2d 249].)

We find that Kathey is a vexatious litigant within the meaning of section 391, subdivision (b)(1). Pursuant to section 391.7, henceforth Kathey may not file any new litigation in the courts of the State of California in propria persona without first obtaining leave of the presiding judge of the court where the litigation is proposed to be filed. (§ 391.7, subd. (a).) Disobedience of this order may be punished as a contempt of court. (*Ibid.*)

## DISPOSITION

The judgment is affirmed (H034104). The order awarding attorney fees, etc., is affirmed (H034127). The order confirming accounting, etc., is affirmed (H034869). The order awarding sanctions is affirmed (H035337). The order awarding sanctions is affirmed (H036368). Pursuant to Code of Civil Procedure section 391.7, subdivision (f), upon the issuance of the remittitur, the clerk of the Court of Appeal is directed to send a copy of this opinion and a conforming Judicial Council MC-700 form (prefiling order—vexatious litigant) designating Kathey Fyke as the subject to the Judicial Council for inclusion in the record of vexatious litigants and dissemination to all courts of this state. (Code Civ. Proc., § 391.7, subd. (f).)

Rushing, P. J., and Elia, J., concurred.

A petition for a rehearing was denied March 19, 2012, and appellant's petition for review by the Supreme Court was denied May 9, 2012, S201354.