Filed 9/10/14  Marriage of Bell CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of CATHERINE BELL and JON D. BELL. | |
| | D064293 |
| CATHERINE BELL, | |
| Appellant, | (Super. Ct. No. D525101) |
| v. | |
| JON D. BELL, | |
| Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, David M. Rubin, Judge.  Affirmed.

Law Office of Katherine Winn and Katherine Winn for Appellant.

Jon Bell, in pro. per., for Respondent.

In this appeal following dissolution proceedings, Catherine Bell challenges an award of $70,000 in sanctions to her former husband, Jon Bell, under Family Code

section 271.[1] Catherine argues there is insufficient evidence to support that she engaged in sanctionable conduct. She also asserts the court erred because the award sanctioned her in a duplicative manner; the court did not consider the conduct of both parties; and the court failed to properly consider the financial burden placed on her. We reject these contentions and affirm.

FACTUAL AND PROCEDURAL OVERVIEW

The dissolution proceedings before the trial court commenced in September 2010 and involved protracted, highly contentious litigation. The parties were married for 16 years and had two children, a daughter and a son, who at the time of the dissolution petition were ages 12 and eight. Numerous experts were retained to address the parties' disputes over child custody and division of community assets, including a court-appointed child custody evaluator, a family court services counselor, a parenting coordinator, a reunification therapist and other individual therapists, and a court-appointed special master for the financial and property issues.

Jon was represented by the same attorney throughout the proceedings. Catherine was represented by an attorney when she filed the dissolution petition; about three weeks later she hired a different attorney who represented her for one year; she thereafter represented herself throughout the custody and property trials; and she then retained a third attorney to represent her at posttrial proceedings. The custody issues were litigated in April 2012; the property issues were litigated in May 2012; and additional posttrial

---

[1] Subsequent unspecified statutory references are to the Family Code.

proceedings occurred in August 2012 and thereafter. Before and after the trial portions of the proceedings, the parties filed numerous motions and repeatedly appeared before the court to address a wide variety of disputes, related to such matters as vocational and psychological evaluations, judge disqualification, discovery, protective orders, child and spousal support, child custody and visitation, trial bifurcation, and attorney fees and sanctions.

Two judges presided over the proceedings; Judge Robert Longstreth ruled on many of the pretrial motions, and Judge David Rubin presided over the case through trial and posttrial proceedings. By June 2012, Jon reported that he had spent $217,126.08 on attorney fees, and he requested that Catherine pay him $112,500 of this amount. In support, Jon relied on the family law need-based statute (§ 2030), the family law sanctions statute (§ 271), and a Code of Civil Procedure sanctions statute for discovery violations.

In its written statement of decision filed on December 17, 2012, the court denied Jon's request for need-based attorney fees, but awarded him $70,000 in sanctions under section 271. The court found that considering Catherine's actions as a whole, she had "frustrated efforts to minimize litigation"; used an "unnecessarily aggressive approach to the case thwarting the reduction of litigation and possibility of settlement"; and "unjustifiably and unnecessarily lengthened" the court proceedings. The court stated her actions "violate[d] the public policy of encouraging early settlement" and admonished her that "[v]igorous pursuit of the legal objective is encouraged; wasteful, time consuming and frivolous tactics are discouraged."

3

To support its conclusion that sanctions were warranted, the court focused on several different actions taken by Catherine during the litigation, including her (1) withdrawal of over $75,000 in community funds the same day she filed the dissolution petition; (2) frivolous objections to Jon's interrogatories; (3) refusal to cooperate with admission of a report prepared by the court-appointed custody expert; (4) failure to give requested documents to the court-appointed special master, disclose a 401K account to the special master, and pay her share of fees owed to the special master and court-appointed custody expert for their trial testimony; (5) inappropriate interference with the real property appraiser during his inspection of the community residence; and (6) arrival at the property trial two hours late and waiting until her arrival to submit her voluminous trial brief and exhibits.

The record reflects that the trial court gave both parties a full opportunity to present their cases and was particularly patient and accommodating to Catherine when she was representing herself. During the lengthy proceedings, the trial court had the opportunity to observe and assess the overall nature of Catherine's conduct and to determine whether she was improperly protracting the litigation by unreasonably refusing to cooperate. On appeal, we draw all reasonable inferences in favor of the judgment below, and it is not our role to second-guess a sanctions award that is supported by the record. (See *In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 995.) As we shall explain, the record supports the court's conclusion that Catherine's actions went beyond vigorous representation and fell into the category of unreasonable and

4

uncooperative conduct that thwarts the policy of expeditious adjudication and promotion of settlement.

## DISCUSSION

### I. *Law Governing Section 271 Sanctions*

Section 271 authorizes the trial court to award attorney fees and costs as sanctions based "on the extent to which the conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys." (§ 271, subd. (a).) Sanctions may be appropriate if a party takes an unreasonable position or engages in uncooperative conduct that frustrates settlement and increases litigation costs. (*In re Marriage of Fong* (2011) 193 Cal.App.4th 278, 290; *In re Marriage of Quay* (1993) 18 Cal.App.4th 961, 970.)

In deciding the issue of section 271 sanctions, the trial court is required to consider the parties' financial situations and should not order a sanction that would impose an unreasonable financial burden on a party. (§ 271, subd. (a).) However, section 271 is not a need-based statute and the party requesting sanctions "is not required to demonstrate any financial need for the award." (*Ibid.*; *In re Marriage of Falcone & Fyke, supra*, 203 Cal.App.4th at p. 990.) Further, there is no requirement of " 'a correlation between the sanctioned conduct and specific attorney fees . . . .' " (*In re Marriage of Falcone & Fyke*, *supra*, at p. 990.) The trial court's broad discretion to award sanctions is premised on the recognition that in marital dissolution cases cooperation between the parties is of paramount importance. (*In re Marriage of Norton* (1988) 206 Cal.App.3d 53, 58.)

5

"Because of the complex and sensitive nature of marriage dissolution proceedings, it is in the best interests of both parties to resolve all issues expediently and congenially: 'The public policy of California strongly favors settlement as the primary means of resolving legal disputes. This is especially true in marital dissolution litigation where it is so clearly in the financial and emotional interests of the parties, especially where they have children, to reach an expeditious and final resolution of their dispute.' " (*Ibid*.)

On appeal, we review a sanctions order for abuse of discretion, and apply a substantial evidence standard of review to any findings of fact. (*In re Marriage of Falcone & Fyke, supra*, 203 Cal.App.4th at p. 995.) The order will be overturned " 'only if, considering all of the evidence viewed most favorably in its support and indulging all reasonable inferences in its favor, no judge could reasonably make the order.' " (*Ibid*.)

## II. *Sufficiency of Evidence To Show Sanctionable Conduct*

To evaluate Catherine's claim that the record does not support that she engaged in sanctionable conduct, we consider the various areas of conduct identified by the trial court in its written statement of decision.

### A. *Withdrawal of Community Funds*

On the date Catherine filed the dissolution petition in September 2010, she withdrew over $75,000 from the community assets. In an October 2010 ex parte motion, Jon requested that she be ordered to return half of the money to him, stating she had "cleaned out" their accounts and used some of the funds to buy a new car with cash. In response, Catherine stated Jon had stopped depositing his earnings in their joint account, and she used the funds to buy the car as planned by the parties, and to pay her attorney,

6

the custody mediator, various community debts, and living expenses since she was a stay-at-home mother and Jon was the primary wage earner. At a hearing in November 2010, the court ruled the question of the return of community cash would be an issue for trial if not resolved earlier. In its written decision after trial, the court stated that Catherine's withdrawal of the cash was in violation of the automatic temporary restraining orders governing community assets and/or unreasonable behavior that added to the contentiousness of the case, created more litigation, and "consumed more time from the court and special master than was defensible or warranted."

Challenging this finding on appeal, Catherine argues her conduct was not unreasonable because the parties had planned to purchase the car prior to separation, and she used the funds to support the family until child and spousal support orders were in effect. Further, she asserts citation of this factor reflects a duplicative award of sanctions because she was charged for the money she withdrew when the community assets were divided. The record shows that child and spousal support orders were entered in November 2010, at the same hearing where the court ruled the issue of the return of the cash would be deferred to trial. Even though as of November 2010 Catherine had a means of supporting the family, she continued to dispute Jon's claim regarding her withdrawal of the community funds, thereby requiring this issue to be addressed by the special master in her May 2012 report and resolved by the court at the ensuing property trial. Even though the court included Catherine's withdrawal of the money when it ruled on the division of assets, it could reasonably conclude her withdrawal of such a large amount of money and her refusal to acknowledge Jon's right to a portion of these

7

community funds was uncooperative conduct that increased litigation costs and frustrated resolution of the case.

## B. *Frivolous Objections to Interrogatories*

During pretrial discovery, Jon served interrogatories on Catherine requesting details concerning her expenses for maintaining the family residence and for her personal support. In her responses, Catherine (who at the time was represented by counsel) failed to provide the requested information, and instead listed a variety of objections (such as unintelligible, ambiguous, vague, compound, undue harassment); stated some of the expenses varied from month to month; and claimed she had insufficient time to review her documents and provide the precise requested information. Thereafter, the parties exchanged correspondence in which Catherine promised to provide the information by a particular date and also agreed to several extensions of the statutory deadline for Jon to file a motion to compel discovery. After Catherine missed the agreed-upon date for providing the information and several more weeks had passed, Jon filed a motion to compel. Even though she had missed the agreed-upon response date and no new response date had been selected, Catherine complained that Jon should not have filed the motion to compel because the extended statutory deadline for the motion was not set to expire for 10 more days. Prior to the hearing on the motion to compel, Catherine provided responses to the interrogatories that were satisfactory to Jon.

At the hearing on the motion to compel, the court (Judge Longstreth) deemed the motion moot because Catherine had complied with the discovery. In his motion to compel Jon had requested $8,828.50 in sanctions based on the fees and costs incurred in

8

filing the motion, and the court deferred this issue for trial. However, in its oral statements at the motion to compel hearing, the court stated its view that Catherine's objections to the interrogatories were frivolous. Further, the court stated that since Catherine missed the agreed-upon date for responses and no new response date had been set, Catherine could not reasonably expect Jon to wait to file a motion to compel until the arrival of the extended statutory deadline for filing the motion.[2]

In its written ruling after trial, the court (Judge Rubin) awarded $5,000 in sanctions for Catherine's noncompliance with discovery. The court noted Judge Longstreth's finding that the objections were frivolous, and stated Catherine's "unwarranted responses to legitimate queries necessitated lengthy preparation for a meet and confer" which did not occur, and although Catherine ultimately complied with the discovery and made the motion to compel moot, Jon's counsel had to expend many unnecessary hours working on the issue.

When awarding the $70,000 in sanctions under section 271, the court cited Catherine's conduct during discovery as supporting its conclusion that overall her conduct warranted sanctions, stating: "As noted above, [Catherine's] approach to discovery caused thousands of dollars in delays and unnecessarily hampered efficient court administration." At a later proceeding addressing the parties' objections to its tentative

---

[2] The actual reporter's transcript of the hearing on the motion to compel is not included in the appellate record; our summation of its contents is derived from quotes in Jon's pleadings.

written statement of decision, the court emphasized that the $5,000 discovery sanction was meant to be distinct from the overall $70,000 sanction.

On appeal, Catherine does not assert the $5,000 discovery sanction was unsupported; however, she contends the $70,000 sanction award included a duplicative amount based on the $5,000 discovery sanction. We reject this contention. The court merely cited Catherine's discovery conduct as one factor, among many, that showed her uncooperative actions that protracted the litigation, and made clear the discovery sanction was separate from the $70,000 sanction. As we shall discuss below, Catherine has not shown the $70,000 amount of the award was an abuse of discretion.

## C. *Refusal To Cooperate with Admission of Report*
### *From Court-Appointed Custody Expert*

Shortly after their separation, the parties stipulated to the use of a private mediator (Dr. Stephen Doyne) to assist them in resolving their child custody issues. The parties agreed that if they did not resolve their dispute, Dr. Doyne would provide the court with a recommendation; his written report would be received into evidence without further foundation; and this agreement did not preclude either party from calling Dr. Doyne for cross-examination. Thereafter, the parties reported the mediation was unsuccessful, and they stipulated that Dr. Doyne would act as a court-appointed child custody evaluator. The stipulation stated the parties would not challenge Dr. Doyne's credentials "when his report and recommendations are submitted to the Court."

Dr. Doyne completed his custody evaluation in April 2011. In his written report, Dr. Doyne recommended joint legal custody and shared physical custody of both

10

children; appointment of a parent coordinator to assist with scheduling and conflict resolution; appointment of a reunification therapist to assist with issues between Jon and the children; and commencement or continuation of therapy for the parties and the children. Dr. Doyne recommended that in therapy, Catherine should work on boundary issues so she could put " 'a firewall between her feelings about her ex-husband and the children, especially [the daughter],' " and on limit setting and supporting the father's relationship with the children. Jon should work on his mood changes, frustrations working with Catherine, and issues related to discipline and alcohol consumption. Further, Dr. Doyne recommended that the parent coordinator be authorized to make changes in the custody arrangements if Catherine continued to " 'involve the children in her issues to such an extent that the children's relationship with the father is impeded' " or if Jon should " 'drink to excess when the children are around him or use inappropriate discipline . . . .' "[3]

After Dr. Doyne provided his April 2011 report to the parties, Catherine filed several pleadings in which she expressed her opposition to the use of the report in the proceedings. In pleadings filed in August 2011, Catherine stated that although she had no significant objections to Dr. Doyne's recommendations, his report included factual misrepresentations, incomplete evaluations of the children, and incorrect insinuations about her. In March 2012 (shortly before the commencement of the custody trial), Catherine reiterated her complaints about Dr. Doyne's report, and stated his report was

_____

[3] Dr. Doyne's report is not included in the appellate record, and our references to its contents are derived from Jon's pleadings.

11

stale because it had been compiled a year earlier; there was no reason to have Dr. Doyne involved in the case since he had nothing of value to offer; and family court services had prepared a more recent and accurate report. Jon, meanwhile, was aware of Catherine's position that Dr. Doyne's report was stale, and accordingly sought to have Dr. Doyne update his report by contacting the parties and various evaluators who had met with the children after his evaluation. Because Catherine opposed any further services by Dr. Doyne, Jon obtained an ex parte order stating that Dr. Doyne, as the court-appointed custody expert, was authorized to perform whatever work he deemed necessary to update his custody evaluation, including meeting with the parties and communicating with other persons, although the parties were not required to meet with him.

In her April 2012 trial brief, Catherine again set forth her complaints about inaccuracies in Dr. Doyne's report and characterized it as "nothing more than a fictional novel with little to do with what was going on in any reality." At the custody trial in April 2012, Jon called Dr. Doyne to testify and Catherine cross-examined him. During his testimony on direct examination, Dr. Doyne stated that his recommendations essentially had not changed since his April 2011 report, except he raised the possibility that the parties' daughter might need to be placed in an out-of-home therapeutic environment to deal with her mental health issues and estrangement from her father that Catherine may be exacerbating. Dr. Doyne emphasized, however, that he could not give a full recommendation on this matter because he had updated information only from Jon; Catherine had not spoken with him to update his report; and Catherine had refused to sign

12

releases so he could speak with the children's other evaluators although he had read their reports.

On cross-examination, Catherine elicited testimony from Dr. Doyne acknowledging that some of his information was not entirely accurate. During Catherine's cross-examination of Dr. Doyne, the court suggested at several points that she focus her questioning on any defects in Dr. Doyne's actual recommendations, and assured her that notwithstanding Dr. Doyne's report, the court viewed her as a devoted mother and it was not going to send her daughter to a residential care facility at this juncture. The court also asked questions of Dr. Doyne to clarify some of the matters at issue, particularly related to mental health concerns for the parties' daughter and the plans for the daughter's phased visitation with Jon.

At the conclusion of the April trial when Jon moved to admit Dr. Doyne's report into evidence, Catherine objected to its admission. The court admitted the report, with a proviso noting that Catherine had pointed out discrepancies in the report.

In its written ruling awarding sanctions, the court stated Catherine "unreasonably refused to cooperate with opposing counsel regarding Dr. Doyne's appearance . . . ." The court stated that neither Jon nor Catherine were pleased with aspects of Dr. Doyne's report, but Jon was prepared to stipulate to its admission whereas Catherine was not. The court reasoned that Catherine's conduct would have been justifiable if Dr. Doyne's testimony had been designed to yield new information, but nothing in his report was undermined by Catherine and she did not elicit anything from him that was not in his

13

written findings. The court concluded that Catherine could have stipulated to admission of the report, and then she and Jon could have argued its weight and merit to the court.

The record shows that immediately upon receipt of Dr. Doyne's report, Catherine was adamantly opposed to its use in the proceedings. The court could reasonably conclude this was an untenable position since Dr. Doyne had been appointed by the court to evaluate the child custody issue and submit a report, and there was no justification for Catherine's unrelenting efforts to prevent the report from being provided to the court. Further, if Catherine had cooperated with Jon's efforts to have Dr. Doyne receive updated information, Dr. Doyne could have spoken with both parties and the various other evaluators to supplement his report before the custody trial. Although Catherine, of course, retained her right to cross-examine Dr. Doyne and the court may well have wanted to ask Dr. Doyne questions, Catherine's pretrial cooperation would have assured that Dr. Doyne had all reasonably available information at his disposal, which could have streamlined presentation of the custody materials to the court. Because Catherine continued fighting use of Dr. Doyne's report and thwarted efforts to update it, Jon's counsel had to obtain an ex parte order confirming that Dr. Doyne had the authority to perform additional services to update his information and had to be prepared to question Dr. Doyne in detail at the custody trial to ensure full presentation of the information in the report. Although ultimately the court admitted the report over Catherine's objection, the court could reasonably conclude that her opposition protracted the custody trial by creating uncertainty, diminishing Dr. Doyne's access to relevant information, and foreclosing the use of stipulations to facilitate resolution of the child custody issues.

14

The record supports that Catherine unreasonably opposed admission of the report from the court-appointed custody expert.

D. *Failure To Give Requested Documents to Court-Appointed Special Master,*

*Nondisclosure of 401(k) Account to Special Master,*

*and Refusal To Pay Fees to Experts for Testimony*

When awarding sanctions, the court found that Catherine "further complicated" the litigation by refusing to pay her share of the special master's and custody expert's fees; not providing the special master with requested documents; and failing to disclose to the special master her $47,000 401(k) account.[4]  Regarding the failure to disclose the 401(k) account, the court elaborated that this conduct further reflected Catherine's inability "to recognize the importance of fully sharing information to assist the court and reduce the amount of litigation necessary to bring this matter to a close."

In her May 2012 report submitted for the property trial, the court-appointed special master stated she had not been provided with all the documents she had requested so her task was not as complete as she would have preferred.  The missing documents included cash flow documents for Catherine's business (Isagenix International) and documents to support several of Catherine's requests for reimbursement.  The special master also reported that although the parties were ordered to share her fees equally, Catherine stated she would not pay her one-half share ($600) of the cost of the special master's testimony because Catherine did not request that she testify.  Similarly,

---

[4]    The court identified the undisclosed account as an IRA account, but according to Catherine it is a 401(k) account.

15

Catherine maintained she should not have to pay her one-half share ($2,262.50) of the cost of testimony from the court-appointed custody expert (Dr. Doyne) because she did not request that he testify. In its written statement of decision, the court rejected Catherine's claim in this regard, stating the special master provided important information on issues disputed by Catherine and the custody expert had to testify because of Catherine's refusal to stipulate to the admission of his report.

As to the undisclosed 401(k) account, in his trial brief Jon informed the court of the existence of this account, provided a December 2009 statement for the account, and noted the special master had not addressed it, apparently because Catherine had not disclosed it to the special master. At trial, Catherine claimed she had not been receiving e-mailed statements for this account because they had been sent to someone else's e-mail, but after seeing the information in Jon's trial brief she contacted the financial institution and obtained information about the account. On cross-examination of the special master, Catherine elicited testimony that it appeared the account was primarily separate property, and the court thereafter ruled the account was 10 percent community property and 90 percent separate property.

Catherine argues the failure to provide documents concerning her reimbursement requests was already sanctioned because she did not obtain the requested reimbursements; she legitimately declined to pay fees for expert testimony she did not request; Jon knew about the 401(k) account; and the amounts at issue for these matters were not significant. Notwithstanding these claims, the trial court could reasonably consider this conduct as an additional indication of her failure to cooperate in a manner

16

that reduced litigation costs. The court could properly assess that her submittal of reimbursement claims without providing supporting documentation improperly increased the work of the special master and the court because the claims still had to be reviewed. Further, the court could determine that her refusal to pay one-half of the fees for the court-appointed experts' testimony was unwarranted given that these experts were charged with providing information to the court and the parties had not stipulated that the court could use their reports in lieu of their testimony. Finally, Catherine has not shown the court erred in relying on her failure to tell the special master about her 401(k) account as another example of her failure to cooperate. Given the totality of her conduct, the trial court was entitled to deduce this nondisclosure reflected her indifference to the need to make reasonable efforts to achieve an expedient resolution of the case.

### E. *Interference with Real Property Appraiser*

To further support its sanctions decision, the court stated that Catherine engaged in unacceptable conduct towards the appraiser who examined the family residence for purposes of valuing this community asset. The court stated the appraiser testified that he left the residence while he was conducting the inspection "because [Catherine] would not leave him alone, walking right behind him as he tried to do his work." The court found that Catherine's conduct in this regard demonstrated an attitude "inconsistent with trying to resolve the case early."

When testifying at trial, the appraiser stated he received a lot of information from Catherine regarding deferred maintenance at the property which he reviewed for purposes of his valuation of the property. When Catherine asked him on cross-examination if he

17

was aware that the base of all the wooden fence posts were disintegrating, the appraiser answered, "I didn't take notice of that because you were following so closely behind me, I had to pay attention to what you were saying as well as make my observations and do my job."

On appeal, Catherine argues the court's finding on this point is unsupported by the appraiser's testimony. Although the appraiser did not testify that he left the property because of Catherine's conduct, the trial court could reasonably deduce that Catherine was following and talking to the appraiser in an overbearing and inappropriate manner while he was trying to examine the property for appraisal purposes. That is, the appraiser stated he failed to notice some deferred maintenance because of Catherine's presence, which inferentially suggests she was not letting him perform his job properly. The court's partial inaccuracy in its summation of the appraiser's testimony does not defeat its general finding that her interaction with the appraiser was another example of her unreasonable conduct that undermined expeditious and cooperative resolution of the case.

F. *Late Arrival and Submittal of Documents at Property Trial*

On the first day of the financial portion of the trial, Catherine arrived at court about two hours late and handed the court "a 4-inch thick binder" of documents, which apparently included her trial brief and 57 exhibits. Catherine told the court she was late because her daughter was ill. Jon's counsel objected to admission of the materials presented by Catherine because he had not had an opportunity to review them. The court told Catherine that it was rarely speechless but it was "speechless today"; it understood how difficult the process was without representation by counsel and it tried to "give pro

18

pers a lot of leeway" but she had gone "too far"; it had never had "400 pages, 500 pages of documents dropped on [it] two hours late for the actual hearing and then expect [it] to be up to speed" on the documents; and she could not treat the court or opposing counsel like this. The court stated it would not review the documents, although Catherine was free to use the documents to refresh witness recollection.

When awarding the sanctions, the court stated that notwithstanding Catherine's explanation that her daughter was ill, her conduct of arriving two hours late and presenting the voluminous documents was "inexcusable" and caused great inconvenience to the court and Jon.

On appeal Catherine argues this factor is duplicative because the trial court already sanctioned her for this conduct by refusing to review her trial brief and exhibits.[5] Further, she contends sanctions were unwarranted for this conduct because it did not delay the trial or increase the litigation costs to Jon. We are not persuaded. First, her conduct made the court and Jon's counsel wait for two hours, which caused an unnecessary increase in Jon's litigation costs and loss of court time. Second, the court could properly conclude that her failure to submit her trial brief and documents before trial hampered expeditious preparation and resolution of the case because Jon and the

_____

5      The record shows that at the conclusion of the property trial the court did admit some of Catherine's exhibits. Catherine claims that because of her late submission of documents the trial court precluded her from raising at trial her request for fees and sanctions, whereas Jon disputes that the court imposed this sanction. Catherine has not cited to anything in the record reflecting a discussion of this specific matter with the court, and accordingly we decline to consider it further. (See *In re Marriage of Freeman* (1996) 45 Cal.App.4th 1437, 1450-1451; *Amato v. Mercury Casualty Co*. (1993) 18 Cal.App.4th 1784, 1794-1795.)

19

court had no definitive guidance concerning what positions she would take during the trial regarding the disputed issues. Although the court may have partially sanctioned her by declining to review some of her documents and/or claims, the court did not err in citing her tardiness and late presentation of documents as an additional factor supporting sanctions.

### III. *Other Contentions of Error*

As set forth above, the record supports that Catherine engaged in uncooperative conduct that increased litigation costs and frustrated settlement, warranting an award of section 271 sanctions. We are not persuaded by Catherine's claim that the court abused its discretion because it did not consider Jon's conduct. While presiding over the lengthy proceedings, the trial court had ample opportunity to observe Jon's actions, and absent an affirmative showing to the contrary, we presume the court was cognizant of Jon's litigation conduct and did not find it inappropriate. (See Evid. Code, § 664; *In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1526 [presume court aware of law and of evidence that may properly be considered].) In support of her contention, Catherine sets forth various actions by Jon during the course of the litigation that she perceives as uncooperative. We have reviewed the record, and none of Jon's actions compel a finding that he was uncooperative. The fact that Catherine may have been displeased with Jon's actions during the litigation does not show the court was required to view his actions as unreasonable.

Further, Catherine has not shown that the $70,000 sanctions award was an unreasonable amount.6 At the time of Jon's sanctions request, he had incurred over $217,000 in legal fees, and he requested that Catherine pay for $112,500 of these fees under the need-based and sanctions statutes. Jon's counsel submitted detailed declarations that set forth his hourly rate and the hourly rate of his support staff; delineated the ever-increasing accrual of fees, including, in particular, after Catherine began representing herself; and specified actions undertaken by Catherine that prolonged the litigation. After presiding over the lengthy proceedings and considering the information submitted by the parties, the trial court declined to award Jon fees under the need-based statute but awarded him $70,000 under section 271. The record supports that Catherine's uncooperative conduct commenced at the inception of the litigation when she withdrew $75,000 in community funds, continued into discovery when she raised frivolous objections to Jon's interrogatories, reached a high level of unreasonableness when she relentlessly attempted to thwart admission of the report generated by the court-appointed custody expert, and spread into a variety of other avenues that frustrated the resolution of the disputed issues. Given the amount of fees incurred by Jon and the

6     In its tentative written decision, the court ordered $65,000 in sanctions under section 271, but prior to its final written decision it increased these sanctions to $70,000. At a hearing on the parties' objections to its tentative decision, the court explained it was increasing the section 271 sanctions because it had erroneously been led to believe that Catherine's status in propria persona meant she had no access to money other than what she would receive through the division of the community assets, whereas it was now apparent she did have funds at her disposal because she had again retained an attorney.

pervasiveness of Catherine's uncooperative conduct, the trial court reasonably selected a sanctions award of $70,000.

Finally, we are not persuaded by Catherine's contention that the court did not properly consider the financial burden placed on her. She asserts the court did not evaluate her financial circumstances or ability to pay $75,000 sanctions (i.e., $70,000 under section 271 and $5,000 discovery sanctions). The court made the sanctions award at the same time as it resolved the disputed property issues and Jon's claim for need-based attorney fees; thus, the court was well aware of Catherine's financial resources. In its December 2012 ruling, the court stated Jon's monthly net income was $9,026, and ordered monthly payments to Catherine of $1,400 in spousal support (reduced to $1,100 in January 2014) and $2,645 in child support. Further, the court noted Catherine was receiving substantial assets from her share of the community property. The family's mortgage-free residence was valued at $580,000 to $590,000, and the court ordered that Catherine be reimbursed for her $34,925 separate property down payment for the purchase of the home. Under the court's ruling, Catherine was allowed to live in the residence with no payments for rent until the house was sold, at which time she would pay the community an amount equal to $1,000 per month from her one-half share of the sale proceeds. Given the court's awareness of the parties' financial circumstances and the

sums Catherine would receive upon the sale of the family residence, she has not carried her burden to show the court failed to properly consider the financial burden on her.[7]

A trial judge who presides over prolonged, highly contentious dissolution proceedings is uniquely positioned to ascertain whether a party is refusing to cooperate and engaging in conduct that exacerbates the parties' disputes and obstructs expedient resolution of the case. The record supports the trial court's conclusion that sanctions were warranted against Catherine, and as an appellate court we defer to this assessment.

DISPOSITION

The judgment is affirmed. Costs to respondent.


HALLER, Acting P. J.

WE CONCUR:


O'ROURKE, J.


IRION, J.

---

[7] The court made some adjustments to the support orders during additional hearings held before entry of the final judgment in May 2013. These changes do not reflect that the $70,000 sanctions would impose an undue burden on Catherine.

23