Filed 9/25/15  P. v. Lee CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>TODD LEE,<br><br>      Defendant and Appellant. | A142287<br><br>(Contra Costa County<br>Super. Ct. No. 05-130856-8) |

Todd Lee was convicted by jury of the attempted premeditated murder of Anthony Yancy (Pen. Code, §§ 187, subd. (a), 664, subd. (a)).  Lee contends that his constitutional rights to present a defense, confrontation, and due process were violated by the trial court's refusal to allow evidence of Yancy's complete criminal history.  We disagree and affirm.

## I.    BACKGROUND AND PROCEDURAL HISTORY

Lee shared an apartment in the city of San Pablo with his girlfriend, Kerin Small, Ashalette Dennis, and Dennis's boyfriend, Deangelo Yancy.[1]  On March 5, 2012, an argument between Small and Tiffany Hopkins, a mutual friend of Small and Dennis, resulted in a physical confrontation between Small and Hopkins in a parking lot in front of the apartment.  Lee and Small later came back with a U-Haul truck to move out of the apartment.  Another physical confrontation ensued in Small's bedroom, with Dennis and Hopkins both fighting Small.  Yancy, Deangelo's brother, was at the apartment during

---

[1] Deangelo and Anthony Yancy are siblings.  Because they share the same surname, we hereafter refer to Deangelo by first name to avoid confusion.

1

the fight. Yancy had brought his eight-year-old son for Deangelo to watch while he went to work. As discussed *post*, versions of events preceding and following these incidents diverge dramatically.

Yancy testified that he and Lee went into Small's bedroom, tried to get the women to stop fighting, and separated them. Yancy said Lee then went outside and returned with a gun in his hand. After the fight broke up, Lee went outside and paced back and forth with the gun still in his hand. Yancy also went outside. He saw a U-Haul truck parked in the driveway. Hopkins left the apartment and went to her car. Lee chased her with the gun in his hand. Hopkins and Yancy said that Lee tried to shoot the gun, but he had problems getting the safety off. Yancy grabbed at Lee's arm and swatted the gun away as Hopkins ran to her car and drove away. Yancy said he tried to calm Lee down and get Lee to put the gun away. Both men were standing between the U-Haul and another vehicle. Lee said he understood what Yancy was saying and said "okay" when Yancy told Lee that he was going to leave. Yancy turned to leave, and Lee shot him in the back of the head, with the barrel of the gun touching Yancy's hair. After Yancy fell to the ground, Lee then shot Yancy in the upper left back area and once again in the lower left back area. A fourth shot missed because Yancy rolled away. Lee ran, and Yancy was driven to the hospital.

Police responded to the scene shortly thereafter and found a large amount of fresh blood and four .22-caliber "Super X" expended shell casings on the ground between a U-Haul truck and a white pickup truck parked beside it. The four spent casings were the same make and model, suggesting they were fired from the same gun. The gun was a semiautomatic because it ejected and left extraction marks on the spent casings.

Yancy was interviewed that evening by San Pablo Police Officer Melvin Smith, Jr., in the emergency room at Kaiser Hospital in Richmond. Yancy had gunshot wounds to his left ear canal, left back, and left side. Yancy said the person who shot him was Jamaican and lived in the apartment near where he was shot. Yancy knew him by the street name of "Top Shotta." Yancy identified Lee as the shooter from a photo lineup the following day. Yancy was hospitalized for seven days, and he had to learn to walk

again following the shooting. He lost hearing in his left ear as a result of the gunshot wound to the head.

Dennis was interviewed by police the evening of the shooting and identified Lee in a photo lineup. She told police that Lee's first name was Todd, he was Jamaican, and he was known as "Top Shotta." Before the shooting, Dennis observed Lee outside the apartment with a gun in his hand and heard Yancy telling Lee to calm down.

Lee was charged by information with attempted willful, deliberate, and premeditated murder (Pen. Code, §§ 187, subd. (a), 664, subd. (a)). Several enhancements also were alleged: use and discharge of a firearm (*id.*, §§ 12022.5, subd. (a), 12022.53); infliction of great bodily injury (*id.*, § 12022.7, subd. (a)); and prior strike convictions for which prison terms had been served (*id.*, §§ 667, 667.5, subd. (b), 1170).

*Defense and Prosecution Motions in Limine*

Prior to trial, Lee filed a motion in limine seeking to "impeach [Yancy] with both his prior convictions and with specific acts of dishonesty. (Evid. Code, § 780[, subd.] (e).)"[2] Specifically, the defense sought to introduce evidence of the following incidents:

---

[2] Evidence Code section 780, subdivision (e) provides: "Except as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to any of the following: [¶] . . . [¶] (e) His character for honesty or veracity or their opposites." Lee did not seek to offer the evidence to show Yancy's propensity for violence or intention to use force or violence against Lee or Small; nor did Lee seek to offer evidence of Yancy's past violent behavior to show that Lee consequently had a reasonable belief in the need to use force in self-defense or defense of another. (*See, id.*, §§ 1101, 1103.) Lee cites Evidence Code sections 1101 and 1103 in briefing here, but presents no discussion or argument as to how they might be relevant to this appeal. Failure to present any reasoned argument waives these issues. (*In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 1004–1005.)

"a. 12/18/2013 [¶] Mr. Yancy committed an act of domestic violence against Lakeishama Stokes. [He] lied to Officer Aaron Mandell when he denied the incident. Mr. Yancy was arrested for this incident but no formal charges have yet been filed.

"b. 4/23/2007 [¶] Mr. Yancy committed the crime of felon in possession of a firearm and lied to an officer regarding his possession of the firearm. [He] pled to a felony [Penal Code section] 12021(a)(1).

"c. 3/19/2006 [¶] Mr. Yancy committed the crime of selling marijuana and lied to an officer regarding the sale of marijuana.

"d. 10/20/2005 [¶] Mr. Yancy committed an act of domestic violence against the person of Shanita Preson and lied to Officer Cantrell when he denied the incident.

"e. 4/28/2004 [¶] Mr. Yancy robbed and abused his elderly landlord. [He] pled to felony violations of [Penal Code sections] 211 and 368(d).

"f. 4/20/02 [¶] Mr. Yancy pimped a twelve year old girl in San Francisco and lied to Officer Baretta when he denied his association with the prostitute.

"g. 8/20/2001 [¶] Mr. Yancy committed a robbery in the Richmond BART station and lied to officers when he denied his involvement in the robbery.

"h. 11/30/2000 [¶] Mr. Yancy committed a robbery and lied when he claimed the victims were the aggressors."

In opposing the motion, and submitting their own motion in limine, the People agreed that Yancy had the following criminal history:

"a. 11/30/00- Mr. Yancy was arrested for [robbery] based upon a fight that occurred. No charges were filed.

"b. 8/20/01- Mr. Yancy was arrested for and charged with [attempted robbery] where [he], along with a group of co-responsibles, allegedly tried to steal the victim's wallet and later assaulted him. Mr. Yancy was charged in Contra Costa County case number 2-270836-0 and was subsequently acquitted after a jury trial.

"c. 8/30/02- Mr. Yancy was charged with and convicted of a misdemeanor violation of [Penal Code former section] 12031, possession of a loaded firearm.

4

"d. 4/28/04- Mr. Yancy was charged with . . . assaulting an elderly man and stealing his wallet and cell phone. [He] was convicted of felony violations of [Penal Code sections] 211and 368 and was sentenced to 3 years of felony probation and 270 days in the county jail in Contra Costa County case number 2-283479-4.

"e. 10/20/05- Mr. Yancy allegedly grabbed his female roommate by the throat and threatened to kill her. This case was not submitted to the district attorney's office for filing.

"f. 3/19/06- Mr. Yancy was charged [under Health and Safety Code section] 11360 after a police officer observed him conduct a hand-to-hand marijuana transaction. [He] was convicted of a misdemeanor violation of [Health and Safety Code section] 113579(b) in Contra Costa County case number 2-290594-1.

"g. 4/23/07- Mr. Yancy was arrested for and convicted of a felony violation of [Penal Code section] 12021 in Contra Costa County case number 2-294643-2. [He] pled "no contest" and was sentenced to 16 months in state prison.

"h. 4/20/02- Mr. Yancy was arrested for loitering with the intent to commit prostitution in San Francisco. A juvenile female was also arrested at the same time. It does not appear charges were ever filed.

"i. 12/18/13- Mr. Yancy was arrested for 2 separate incidents of domestic violence. On that date, the mother of one of [his] children, Lakeishama Stokes, reported that [he] had choked her to the point of unconsciousness on November 17, 2013, and grabbed her by the throat on the morning of December 17, 2013. She did not report either incident to the police until December 18, 2013. [He] was arrested, admitted they argue, but denied that those arguments had ever turned physical. As of January 7, 2014, these cases have not been submitted to the District Attorney's office for filing.

"j. 5/23/06- Manoy Carter reported that during an argument Mr. Yancy grabbed her by the throat and struck her in the eye. The two have a child in common. She also admitted punching and kicking [him]. [He] was not arrested, and no charges were ever filed." (Boldface & some capitalization omitted.)

5

A hearing on these motions in limine was held on January 16, 2014. Following argument of counsel, the court ruled as listed below.

(1) The November 2000 robbery arrest was excluded because no charges were filed.

(2) The arrest and charges in relation to an August 2001 attempted robbery were excluded because Yancy was acquitted.

(3) The August 2002 misdemeanor firearm possession conviction was excluded because it was "remote in time and not sufficiently probative."

(4) The April 2004 felony convictions for the assault and robbery of an elderly man could be used for impeachment, but the court noted that under Proposition 8, "If the witness admits the felony conviction on direct, the adverse party is only allowed to question the witness about the 'name or nature of the crime and the date and place of the conviction.' [¶] They cannot question him about what he did to the old man, what happened—so it's literally quite limited unto itself, what the impeachment can be. I do not anticipate having a trial within a trial with regard to the [violations of Penal Code sections] 211 and 368. However, I do find that the fact that Mr. Yancy was convicted of such serious and violent assaultive type crimes is evidence that balancing under [Evidence Code section] 352, and understanding that it was almost ten years ago, is still necessary for the jury to fully understand who Mr. Yancy is or has been. [¶] But once again it would limit you, [defense counsel], to those specific questions—only the date and time [*sic*] of the conviction and the nature of it. So with that I am finding that the specific Penal Code sections would be admissible for impeachment as to Mr. Yancy."

(5) The October 2005 allegation of grabbing and threatening a female roommate was excluded "because it was not submitted to the District Attorney's office for filing."

(6) Evidence relating to the March 2006 sale of marijuana was excluded, with the court commenting, "[T]he marijuana charge— . . . Mr. Yancy was ultimately convicted of a misdemeanor violation of a possession. And so the act of whatever he did with the police officer is again too remote, too tangential and not sufficiently probative. Therefore I am excluding that information."

6

(7) The April 2007 felony conviction was allowed "and the specific nature of it, the fact that it was a [Penal Code section] 12021. That is a felon in possession of a firearm." The court declined to permit defense counsel to explore what he characterized as Yancy's lie to the investigating officer about the gun. "I am allowing the fact that he had a gun, and I am going to permit that in; but I will not have a mini trial. I think it would be undue use of the jury's resources and so tangential as to distract the jury from the actual charges. And I think the fact that it's not only a felony violation but the fact that he possessed a weapon is sufficiently instructive to the jury for them to draw the conclusions. So no, I will not permit the additional interaction with the officer to be explored in this trial."

(8) The April 2002 arrest for loitering with intent to commit prostitution was excluded with the court stating: ". . . I am finding under [Evidence Code section] 352 that the probative value does not outweigh the prejudicial value. Moreover, it's extraneous and would use undue resources with regard to the jury. So I will not allow the juvenile female—or now adult female—to testify about—that incident itself will not be referred to or questioned."

(9) The December 2013 arrest for two incidents of domestic violence was excluded with the following ruling: "[T]he [Evidence Code section] 352 value would be that it would be much more cumbersome for a jury to have these incidents introduced because they're not convictions. They appear to be just arrests." The court further observed "the probative value is outweighed by the prejudicial value and that it will confuse and mislead the jury and since there's no definitive answer as to what the actual facts are it would result in undue use of the court's resources to have a trial on it."

(10) A May 2006 incident of domestic violence was excluded "because no charges were ever filed."

*Trial Evidence*

Prosecution Case

Yancy testified as indicated previously. He admitted his felony convictions, and the nature of those convictions, on direct examination. Hopkins and Dennis testified,

7

generally corroborating Yancy's version of events, as did a bystander present in the apartment at the time of the shooting, Deon Davis.[3] A neighbor who lived above the apartment testified he heard an argument downstairs that moved outside, with about six men and women involved. The neighbor saw Lee come from the street carrying a black handgun that looked like a .22 revolver, and he saw Lee follow a man. The neighbor heard gunshots and saw Lee run away.

Defense Case

Small testified that during the second fight in her bedroom, Davis and Yancy joined in the fight and "they all just started jumping" her—holding her down, pulling her hair, and punching and kicking her. After the fight, Small saw Yancy exit the apartment, holding a black handgun in his hand. As she attempted to get her cellphone from the U-Haul, Yancy jumped out from between the U-Haul and another vehicle, grabbed her arm, twisted her around, and choked her. She saw Yancy reach for a gun and was really frightened. She then heard gunshots and thought she was dead. When Small realized she had not been shot, she ran away. She did not see Lee shoot Yancy. She met Lee later near an auto parts store where they had previously gone to repair her car. Lee and Small drove to her uncle's house in Oakland. She saw that Lee had a black gun and told him to throw it away.[4] Lee did so.

Lee testified. He said that after an earlier argument on the day of the shooting, Deangelo had told him that Dennis wanted Lee and Small to move out of the apartment, and they agreed. He and Small then drove Small's car to a nearby auto parts store where he worked on it. Small and Lee walked back to the apartment from the auto parts store

---

[3] Davis testified that Lee and Yancy started fighting inside the apartment after the altercation between the women, and that their fight went outside. Davis told police that Yancy was just trying to get Lee out of the house.

[4] In rebuttal, a police detective testified that, in an interview with Small, she never said Yancy tried to grab her by the throat or reached for a gun, never said Lee was her boyfriend, saw Lee that night, or that she drove with Lee to Oakland. Small said her boyfriend's first name was Kevin, she did not know his last name, and he was not present during the shooting.

together, where Hopkins, Deangelo, and several other men attacked them in the parking lot. After the fight, Deangelo said they could come back to the apartment and get their belongings.

Lee and Small rented a U-Haul truck, which Small drove back to the apartment while Lee drove Small's car. On the way back to the apartment, Lee saw his friend, Yancy, walking and picked him up in Small's car. The car was acting up, so Lee parked at a grocery store near the auto parts store and directly across a creek from the apartment building. Lee asked Yancy to go to the apartment and help Small. When Lee arrived at the apartment building, he saw the U-Haul parked on the street with the engine running and the keys and Small's purse inside, so he drove the U-Haul down the driveway. Lee heard screaming from the apartment, ran inside, and found Small on the bedroom floor with women and men, including Yancy, beating her and trying to kill her. When a man pushed him back from the bedroom door, Lee retrieved his long black .22-caliber semiautomatic handgun from a kitchen cupboard. He went back to the bedroom and pointed the gun at people to scare them off. Everybody ran. Lee ran out of the apartment in a panic. He saw Hopkins run outside and ran after her with his gun by his side because he thought Hopkins was going to get her .38 caliber gun from her car's glove box. Lee also was afraid that the men were running to get their guns. Hopkins stopped at her car and said, "Please, don't shoot me." Lee told her to just leave and she drove away.

Lee started to look for Small. He saw Yancy driving the U-Haul up the apartment driveway. Yancy sped up and tried to run him over. Yancy parked the U-Haul on the street. Lee ran to the driver's door, and Yancy got out. The two men argued. Yancy told Lee he was a "dead man walking" and reached to his waist under his shirt for what Lee recognized as a Glock pistol. Lee pointed his gun at Yancy, who pulled his shirt back down over the Glock. Lee told Yancy that he just wanted to get Small and leave.

Yancy walked toward Lee as Lee backed away, and grabbed for Lee's gun hand. Lee again pointed his gun at Yancy, and Yancy ran toward Small, who was between the U-Haul and another vehicle. Yancy held Small and appeared about to raise his gun. Lee feared for Small's safety and fired his gun from a distance of about five feet. Yancy's

gun fell out of his hand, but he attempted to retrieve it. Lee shot him again. Lee ran to the parking lot where Small's car was parked. He saw Small run through the parking lot and picked her up. She had bruises on her face and asked to go to her uncle's house in Oakland. Small became upset when she saw Lee's gun in his lap. Lee threw the gun out the window of the car. Lee avoided the police for two months before they caught him. Lee believed he was defending Small and himself when he shot Yancy. Lee was impeached with four prior felony convictions: two separate moral turpitude convictions in 2001 from Florida; a felon in possession of a firearm conviction in 2007 from Florida; and an assault with a deadly weapon conviction in 2010 from Alameda County.

*The Verdict*

The jury found Lee guilty as charged and found the firearm and great-bodily-injury allegations to be true. In a subsequent bench trial, the court found true one prior strike conviction for which Lee had served a prison term.[5] The court sentenced Lee to life with the possibility of parole for attempted premeditated murder plus a term of 44 years to life—14 years to life for the prior strike conviction; a consecutive term of 25 years to life for discharging a firearm; and a consecutive term of 5 years for the prior prison term. Additional terms for firearm use and infliction of great bodily injury were imposed and stayed (Pen. Code, § 654). Lee filed a timely notice of appeal.

## II.    DISCUSSION

Lee challenges only the court's evidentiary rulings on the motions in limine. He contends that exclusion of significant portions of Yancy's prior criminal history "left the jury with an incomplete picture of [Yancy's] extensive criminality and propensity to lie to police, casting his testimony in a false aura of reliability." This error, he insists, deprived him of his federal and state constitutional rights to due process, confrontation and cross-examination.

---

[5] The court found that Lee's prior Florida convictions failed to qualify as "strikes" under California law.

10

The constitutional right of confrontation includes the right to cross-examine adverse witnesses on matters reflecting on their credibility. (*People v. Quartermain* (1997) 16 Cal.4th 600, 623.) " '[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby, "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." ' (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680 . . . , quoting *Davis v. Alaska* (1974) 415 U.S. 308, 318 . . . .) However, not every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance. [Citations.] California law is in accord. [Citation.] Thus, unless the defendant can show that the prohibited cross-examination would have produced 'a significantly different impression of [the witnesses'] credibility' [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment." (*People v. Frye* (1998) 18 Cal.4th 894, 946, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22; see *People v. Linton* (2013) 56 Cal.4th 1146, 1188; *People v. Lucas* (2014) 60 Cal.4th 153, 271, disapproved on other grounds by *People v. Romero* (Aug. 27, 2015, S055856) ___ Cal.4th ___ [2015 Cal.Lexis 5759].)

"[T]he Confrontation Clause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish." (*Delaware v. Fensterer* (1985) 474 U.S. 15, 20.) "Moreover, '[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense' " (*People v. Dement* (2011) 53 Cal.4th 1, 52), and judges retain wide latitude to impose reasonable limits on cross-examination (*People v. Quartermain, supra,* 16 Cal.4th at p. 623). "Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice,

11

confusion or consumption of time." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.) We review the trial court's rulings on the admissibility of evidence under the deferential abuse of discretion standard. (*People v. Lucas, supra,* 60 Cal.4th at p. 268; *People v. Doolin, supra,* 45 Cal.4th at p. 437.)

*Impeachment Evidence*

"Past criminal conduct involving moral turpitude that has some logical bearing on the veracity of a witness in a criminal proceeding is admissible to impeach" a witness. (*People v. Harris* (2005) 37 Cal.4th 310, 337.) Moral turpitude offenses "include crimes in which dishonesty is an element (i.e., fraud, perjury, etc.)." (*People v. Chavez* (2000) 84 Cal.App.4th 25, 28.) " '[T]he latitude [Evidence Code] section 352 allows for exclusion of impeachment evidence in individual cases is broad. The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues.' " (*People v. Ayala* (2000) 23 Cal.4th 225, 301.) Our Supreme Court has " 'repeatedly held that "not every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance." ' " (*People v. Harris* (2008) 43 Cal.4th 1269, 1292.)

The trial court permitted impeachment of Yancy with three prior felony convictions—for robbery, elder abuse, and felon in possession of a firearm. The court declined to permit Lee to introduce evidence about charges on which Yancy was acquitted; Yancy's misdemeanor convictions; and conduct that resulted in no criminal charges. Lee also was precluded from presenting evidence that Yancy had purportedly "lied" to police about his culpability in several of these incidents, including the 2007 felony firearm conviction.

In determining what evidence to admit, and what to exclude, the court reasoned that Yancy's 2002 misdemeanor conviction for possession of a loaded firearm was "remote in time and not sufficiently probative." The court similarly declined to permit evidence of Yancy's misdemeanor marijuana possession conviction. "Misdemeanor

convictions . . . are not admissible for impeachment, although evidence of the underlying *conduct* may be admissible subject to the court's exercise of discretion." (*People v. Chatman* (2006) 38 Cal.4th 344, 373; see *People v. Wheeler* (1992) 4 Cal.4th 284, 295–297.) "[I]mpeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present. Hence, courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value." (*Wheeler*, at pp. 296–297, fn. omitted.) The court properly did so here.

The incidents involving unadjudicated conduct would have required presentation of several additional witnesses and the probability of conflicting testimony. For the evidence to have any relevance at all, the jury would be required to evaluate the credibility of not only Yancy as to these incidents, but the credibility of each collateral witness on each separate matter—essentially requiring a "mini trial" on each incident. The trial court reasonably found the proposed evidence was "extraneous and would use undue resources with regard to the jury," and in other respects would be "cumbersome" and would "confuse and mislead the jury and since there's no definitive answer as to what the actual facts are it would result in undue use of the court's resources to have a trial on it." The court justifiably concluded that the potential probative value of such evidence did not outweigh the prejudice from its introduction.

As to Yancy's allegedly false statements to police, the court again expressed concern with the need to have a "mini trial" on issues the court found to be "tangential" and "not sufficiently probative." The court found that "it would be undue use of the jury's resources and so tangential as to distract the jury from the actual charges." We agree that presentation of this evidence "would have required a significant time-consuming detour into the circumstances [several years] earlier under which each statement was made." (*People v. Dement*, *supra*, 53 Cal.4th at p. 51 [not error to preclude impeachment of jailhouse informant with his statements from his own prior homicide trial]; see *People v. Gurule* (2002) 28 Cal.4th 557, 619–620 [no abuse of discretion to exclude evidence that a witness had in other crimes admitted some blame

13

but shifted responsibility to others, as it was time-consuming hearsay and not particularly probative character evidence].)  The trial court here did not abuse its discretion in excluding this collateral evidence.

The jury heard that Yancy had committed the felonies of robbery and elder abuse in 2004, and that he had had been convicted of being a felon in possession of a firearm in 2007.  Lee fails to show how cross-examination on comparatively less serious unproven conduct would have produced "a significantly different impression of [Yancy's] credibility."  (*Delaware v. Van Arsdall, supra,* 475 U.S. at p. 680.)  We find no error.

### III.    DISPOSITION

The judgment is affirmed.

14

_____
BRUINIERS, J.

WE CONCUR:


_____
JONES, P. J.


_____
SIMONS, J.

A142287